943 F.Supp. 975 (1996)
BROWNSBURG AREA PATRONS AFFECTING CHANGE, and John Patten, Founder and Leader of Bapac, Plaintiffs,
v.
Patricia BALDWIN, in her official capacity as Prosecuting Attorney for Hendricks County, Indiana, Pamela Carter, in her official capacity as Attorney General for the State of Indiana, William E. Daily, in his official capacity as the Chairman of the Hendricks County Election Board, Connie Lawson, in her official capacity as the Secretary of the Hendricks County Election Board, Dolly Starnes, in her official capacity as a Member of the Hendricks County Election Board, Jeffrey M. Mallamad, in his official capacity as the Chairman of the Indiana Election Commission, Butch Morgan, in his official capacity as a *976 Member of the Indiana Election Commission, Joseph M. Perkins, Jr., in his official capacity as a Member of the Indiana Election Commission, and Dudley Cruea, in his official capacity as a Member of the Indiana Election Commission, Defendants.
No. IP 96-1357-C H/G.
United States District Court, S.D. Indiana, Indianapolis Division.
October 23, 1996.
As Corrected November 21, 1996 nunc pro tunc.
*977 John K. Abegg and James Bopp, Jr., Bopp, Coleson & Bostrom, Terre Haute, IN, for plaintiffs.
Beth H. Henkel and James A. Joven, Office of the Attorney General, Indianapolis, IN, for defendants Baldwin, Carter, Mallamad, Morgan, Perkins and Cruea.
Paul A. Hadley and Michael G. Worden, Danville, IN, for defendants Daily, Lawson, and Starnes.

ENTRY ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
HAMILTON, District Judge.

Introduction
In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court held that the First Amendment imposes significant restrictions on the powers of state and federal government to regulate contributions and expenditures for political purposes. The Supreme Court drew a bright line in Buckley between what it called "express advocacy," which is speech that uses express words to advocate the election or defeat of a clearly identified candidate for office, such as "vote for," "elect," "support," "defeat," or "reject," and what is often called "issue advocacy," meaning political speech about issues and candidates that does not amount to express advocacy. See 424 U.S. at 44 & n. 52, 96 S.Ct. at 646-47 & n. 52. Under Buckley v. Valeo, the government may impose certain organizational and reporting requirements and expenditure and contribution limits on express advocacy, but any power to regulate the broader category of issue advocacy is far more limited. Plaintiffs Brownsburg Area Patrons Affecting Change and John Patten challenge the constitutionality of Indiana's statutes regulating political action committees. Indiana election laws define a "political action committee" ("PAC") so as to include an organization that accepts contributions or makes expenditures of more than $100 a year "to influence" elections. Ind.Code § 3-5-2-37(a)(1)(C). Plaintiffs contend that this definition is unconstitutionally broad because it imposes PAC regulatory requirements on organizations engaged only in "issue advocacy." Plaintiffs also object to the absence of language limiting the definition to organizations whose "major purpose" is to engage in express advocacy.
Plaintiffs seek a preliminary injunction to prevent enforcement of Indiana's laws regulating PACs against them. They assert that the overly broad statute is chilling their ability to engage in constitutionally protected speech in connection with the general election scheduled for November 5, 1996. Defendants are state and county officials who argue that the Indiana statute is constitutional when properly interpreted. They also assert that plaintiffs present no case or controversy within the meaning of Article III of the United States Constitution, and argue that this court should abstain from deciding the merits of plaintiffs' claims under the abstention *978 doctrines of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Plaintiffs' motion for preliminary injunction is before the court on a factual record that consists of plaintiffs' verified complaint (with exhibits), plaintiffs' responses to requests for admissions and to interrogatories, the deposition of plaintiff Patten, and the testimony of defendant William E. Daily. The court heard Mr. Daily's testimony and argument by counsel on October 11, 1996, and the motion for preliminary injunction is now ripe for decision.
For the reasons explained below, plaintiffs' motion for preliminary injunction is denied. When properly interpreted, the Indiana definition of a "political action committee" simply does not apply to plaintiffs because they have engaged and intend to engage only in "issue advocacy." This entry sets forth the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 and 65.

Findings of Fact

I. The Parties
Plaintiff Brownsburg Area Patrons Affecting Change, known as "BAPAC," is a small and loosely organized association of persons who live in and around Brownsburg, a town in Hendricks County, Indiana. BAPAC has no membership requirements, no officers, and no directors. It is not associated with any political candidate, political party, or campaign committee. BAPAC initially formed to organize opposition to the proposed construction of a steel mill in the Brownsburg area. Currently, its major purpose is to educate people in the Brownsburg area about political, economic, and social issues, and to serve as a means for people to express their views to public officials. Plaintiff John Patten is the "founder and leader" of BAPAC and is the principal agent of BAPAC.
All defendants are state or county officials who are sued in their official capacities. Defendant Patricia Baldwin is the Prosecuting Attorney for the 55th Judicial Circuit in Indiana, which is Hendricks County. Defendant Pamela Carter is the Attorney General of the State of Indiana. Defendants William E. Daily, Connie Lawson, and Dolly Starnes are the members of the Hendricks County Election Board. Defendants Jeffrey M. Mallamad, Butch Morgan, Joseph M. Perkins, Jr., and Dudley Cruea are the members of the Indiana Election Commission.[1]

II. BAPAC Activity
To educate residents in the Brownsburg area about various issues, BAPAC has distributed printed flyers and has used a telephone "hotline." The hotline consists of recorded messages on a telephone answering machine describing candidates' positions on issues and sometimes stating whether those positions coincide with BAPAC's views. In particular, BAPAC distributed flyers and used hotline messages in the days leading up to the primary election held on May 7, 1996. Those flyers and messages identified candidates for office and described the ways in which several candidates had agreed with or actively supported positions taken by BAPAC. The messages also encouraged callers to vote, informed callers that Democrats could vote in the Republican primary if they wanted to do so, and invited callers to add their names to BAPAC's mailing list. The BAPAC flyers and messages at the time of the May 1996 primary were all intended to "influence" the elections, at least in the broad sense of that term. However, all BAPAC flyers and hotline messages at the time of the primary election stopped short of "express advocacy," i.e., they did not use express terms advocating the election or defeat of clearly identified candidates for office.
BAPAC spent approximately $464 to engage in "issue advocacy" in connection with the May 1996 primary election. This amount includes $250 for producing 4,000 flyers and $100 to pay an artist for designing a logo for BAPAC. The total also includes pro-rated *979 amounts totaling $114 for use of plaintiff Patten's home, including his telephone line, computer, fax machine, office space, utilities, and insurance. BAPAC treats these last items as in-kind contributions from Mr. Patten.

III. Indiana Statutes on PACs
The Indiana election code imposes substantial organizational and reporting requirements on political action committees. See generally Ind.Code § 3-9-1-1 et seq. (organizational requirements); § 3-9-2-1 et seq. (regulation of contributions); § 3-9-3-1 et seq. (regulation of expenditures); § 3-9-4-1 et seq. (role of election boards); § 3-9-5-1 et seq. (reports required). For example, a political action committee must have a chairman and treasurer, § 3-9-1-2, and must file a statement of organization within ten days after its organization or after it becomes a committee subject to regulation, § 3-9-1-3. The statement of organization must provide identifying information, including a listing of banks and other financial depositories used. A number of provisions restrict the flow of money and property to ensure accountability. For example, no one may make an expenditure or accept a contribution on behalf of a committee without authorization from the chairman or treasurer. Ind.Code § 3-9-1-2. All money or other property collected must pass through the hands of the committee's treasurer, and money and property disbursed must be disbursed by the treasurer. Ind. Code §§ 3-9-1-20, -21. The treasurer must keep detailed accounts of contributions and expenditures. Ind.Code §§ 3-9-1-22, -23. The committee must then file detailed financial reports with either a county election board or the Indiana Election Commission, and those reports are available for public inspection. Ind.Code §§ 3-9-5-1, -2, -4, -6, -10. The required contents of the financial reports are set forth in § 3-9-5-14, and include the names and addresses of each person who contributes more than $100 in a year, and all expenditures of more than $100 in the aggregate in a year.
Plaintiffs assert that failure to comply with the reporting or other requirements can subject the committee and its officers or principals to civil and criminal penalties. See Ind. Code § 3-9-4-16 (civil penalties imposed by Indiana Election Commission for numerous violations), Ind.Code § 3-9-4-17 (civil penalties imposed by county election boards for numerous violations); Ind.Code § 3-14-1-7 (expenditure of money without appointing and maintaining treasurer is misdemeanor), Ind.Code § 3-14-1-14 (failure to file reports is misdemeanor). The Indiana Election Commission and county election boards have the duty to ensure compliance with these campaign finance laws, see Ind.Code §§ 3-9-4-13 & -14, they have the power to investigate suspected violations and to refer matters to the Attorney General of Indiana or the appropriate prosecuting attorney, Ind. Code §§ 3-6-4-29, 3-6-4.1-21, 3-6-5-31. The Attorney General and the appropriate prosecuting attorney may pursue civil sanctions, see Ind.Code §§ 3-6-5-31, -32, and the prosecuting attorney may bring criminal charges, Ind.Code §§ 3-6-4-29, 3-6-4.1-21, 3-14-5-4.
The principal issue in this case does not concern the details of these state requirements. The issue is whether any of these requirements may be imposed on BAPAC. Indiana law defines "political action committee" as follows:
(a) Except as provided in subsection (b), "political action committee" means any of the following:
(1) An organization located within or outside Indiana that:
(A) is not:
(i) affiliated with a political party; or
(ii) a candidate's committee;
(B) proposes to influence the election of a candidate for state, legislative, local, or school board office or the outcome of a public question; and
(C) accepts contributions or makes expenditures during a calendar year to influence the election of a candidate for state, legislative, local, or school board office or the outcome of a public question that will appear on the ballot in Indiana that in the aggregate exceed one hundred dollars ($100).

*980 (2) A congressional caucus committee of a national political party;
(3) A state legislative caucus committee of a state political party;
(4) An organization located within or outside Indiana that:
(A) proposes to influence the election of a candidate for a state, legislative, local, or school board office or the outcome of a public question;
(B) accepts contributions or makes expenditures during a calendar year to influence the election of a candidate for state, legislative, local or school board office or the outcome of a public question that will appear on the ballot in Indiana that in the aggregate exceed one hundred dollars ($100); and
(C) is not:
(i) an auxiliary party organization;
(ii) a regular party committee;
(iii) a candidate's committee; or
(iv) described in subdivision (1), (2), or (3).
(b) A corporation or labor organization that makes a contribution in accordance with IC 3-9-2 or makes an expenditure is not considered a political action committee.
Ind.Code § 3-5-2-37. Plaintiffs focus their principal attacks on the phrase "to influence the election of a candidate," and on the absence of any language limiting the definition to groups whose "major purpose" is to engage in "express advocacy" as defined in Buckley v. Valeo.

IV. BAPAC's Contacts with the County Election Board
On June 6, 1996, defendant Baldwin brought to the attention of the Hendricks County Election Board a complaint to the effect that BAPAC had endorsed candidates and published a "slate" of candidates such that BAPAC was required to comply with Indiana laws governing political action committees, including reporting its contributions and expenditures. The same day, County Election Board Chairman Daily wrote to plaintiff Patten describing some of Indiana's election laws governing PACs and stating the County Election Board's concerns. Mr. Daily concluded:
It is not our desire to unduly interfere with your unquestioned right to express your views concerning candidates and issues. However, this Board has the duty to determine whether election laws have been violated. It would be very helpful if you would indicate why you believe that the laws which I have cited do not apply to BAPAC. Your response to this letter can be in writing or by appearance at the Election Board meeting on June 21, 1996.
On June 14, 1996, James Bopp, Jr., an attorney for Mr. Patten and BAPAC, responded to Mr. Daily's letter and asked for a copy of the recorded message, the alleged slate of candidates, and any other materials that had raised the Board's concerns. On July 19, 1996, Mr. Daily sent Mr. Bopp copies of an audio tape and a flyer, and told him that the next Board meeting would be on August 28, 1996. On August 6, 1996, John K. Abegg, also a lawyer for Mr. Patten and BAPAC, and a colleague of Mr. Bopp's, wrote to Mr. Daily. Mr. Abegg asserted that BAPAC is not a political action committee under Indiana law because its "major purpose is not to expressly advocate the election or defeat of any candidate." He also reported that BAPAC had not been responsible for the flyer sent by Mr. Daily.[2] Mr. Abegg concluded: "In light of the foregoing, we feel that the Board should not take any action against either BAPAC or Mr. Patten in regards to the issues implicated in your letters. Please advise us of the Board's resolution of this matter...."
Mr. Daily responded with a letter to Mr. Abegg on August 28, 1996. He reported that the County Election Board had met that day to discuss BAPAC and had not reached "a final decision." Mr. Daily continued:
A political action committee is a nonpartisan organization that makes expenditures in excess of $100.00 during a calendar *981 year to influence the election of a state or local candidate (IC 3-5-2-37). The contents of the audio tape appear to be an attempt to influence the election of a candidate. If BAPAC spent in excess of $100.00 to influence the outcome of a particular contested race, BAPAC should file the reports which are required by the Indiana election laws. An organization may be a political action committee even if the major purpose of the organization is not to advocate the election or defeat of a candidate.
Plaintiffs did not respond further to Mr. Daily. They filed this suit on September 20, 1996. Prior to the filing of the suit, the County Election Board had not made any final decision about BAPAC's status. Mr. Daily testified that he did not believe the Board had sufficient information to determine whether BAPAC had crossed the $100 expenditure threshold. He also testified that, based on plaintiffs' discovery responses concerning their expenditures, he does not believe BAPAC has taken action, at least yet, that brings it within the statutory definition of a PAC. At the time this suit was filed, the Hendricks County Election Board had not initiated any enforcement action against plaintiffs; it had only gathered facts about possible violations, as it had the power and responsibility to do. See Ind.Code §§ 3-9-4-13 to -15.
At the time suit was filed, the defendant Prosecuting Attorney, Attorney General, and members of the Indiana Election Commission had taken no action to enforce or to threaten to enforce Indiana's PAC statutes against plaintiffs.

V. Effects on BAPAC and its Plans
BAPAC intends to spend more than $100 to influence the November 1996 general elections "by discussing candidates and candidates' positions," but to do so "without expressly advocating the election or defeat of any clearly identified candidate." Pl. Response to Interrog. No. 2. BAPAC also intends to take similar steps in future elections. However, BAPAC has not been willing to take this action because it believes that doing so would cause it to be treated as a PAC under Indiana election law and would subject it to "burdensome registration and reporting requirements" backed up by civil and criminal penalties if it failed to comply. Regardless of the outcome of this action, however, plaintiffs have no plans or intentions to expressly advocate the election or defeat of any clearly identified candidate.

Conclusions of Law

I. Standard for Preliminary Injunction
Before the court may enter a preliminary injunction, the moving party must demonstrate "(1) some likelihood of succeeding on the merits, and (2) that it has `no adequate remedy at law' and will suffer `irreparable harm' if preliminary relief is denied." Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir.1992). If those elements are not shown, then the inquiry is over and the preliminary injunction must be denied. If those elements are shown, the court then proceeds to consider "(3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." Id. at 11-12. Accord, e.g., Vencor, Inc. v. Webb, 33 F.3d 840, 845 (7th Cir.1994); Lawson Prods., Inc. v. Avnet, Inc., 782 F.2d 1429, 1433 (7th Cir.1986); Stewart v. Taylor, 934 F.Supp. 1040, 1041 (S.D.Ind.1996) (denying preliminary injunction against enforcement of Indiana election law prohibiting multiple party nominations).
The parties focus their attention on the likelihood of success on the merits, which is discussed fully below. Assuming for purposes of discussion that plaintiffs were reasonably likely to succeed on the merits, they could certainly show that their injuries would be irreparable and that a remedy at law would not be adequate. If Indiana's definition of a PAC were declared unconstitutional after a trial on the merits, plaintiffs would have been irreparably injured due to their inability to engage in free speech, particularly in the context of the upcoming election. Any remedy after a trial on the merits *982 (which would necessarily occur after the election) would be "seriously deficient as a remedy for the harm suffered." Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 386 (7th Cir.1984); see also Grossbaum v. Indianapolis-Marion County Bldg. Auth., 63 F.3d 581, 585 (7th Cir.1995) (plaintiffs would be irreparably harmed by denial of a menorah display during the holidays as an unconstitutional violation of their freedom of expression); Klein v. Baise, 708 F.Supp. 863, 865 (N.D.Ill.1989) (candidate seeking to place political advertisements on buses and bus shelters granted preliminary injunction to enjoin enforcement of Illinois statute prohibiting political advertising on buses and bus shelters).

II. Likelihood of Success on the Merits

A. Application of Indiana's PAC Statute to "Issue Advocacy"
Plaintiffs argue, and defendants do not disagree, that in light of Buckley v. Valeo, state campaign finance statutes may regulate "express advocacy" but may not impose spending and contribution limits and reporting requirements on "issue advocacy."[3] The parties further agree, and the record shows clearly, that plaintiffs have not engaged in express advocacy. Plaintiffs have stated that they do not wish to engage in express advocacy before the upcoming election. Thus, the central issue on the merits is not a question of constitutional law but of statutory interpretation: Whether Indiana's definition of a political action committee applies to organizations engaged only in issue advocacy? Plaintiffs contend that the statutory definition is so broad that they are covered, thus "chilling" plaintiffs' attempt to engage in constitutionally protected speech. Defendants contend that the statute, properly interpreted, reaches only express advocacy. Before addressing the merits, however, the court must deal with the justiciability and Younger abstention issues raised by defendants.

1. Standing and Ripeness
Article III of the United States Constitution provides that federal judicial power extends to all "cases" and "controversies." The doctrines of standing and ripeness are two essential components of a justiciable case or controversy. Smith v. Wisconsin Dep't of Agric., 23 F.3d 1134, 1141 (7th Cir.1994). The standing and ripeness requirements are analytically distinct but closely related. The Seventh Circuit has explained: "It is sometimes argued that standing is about who can sue while ripeness is about when they can sue, though it is of course true that if no injury has occurred, the plaintiff can be told either that she cannot sue, or that she cannot sue yet." Id. (emphasis in original); accord, Warth v. Seldin, 422 U.S. 490, 499 & n. 10, 95 S.Ct. 2197, 2205 & n. 10, 45 L.Ed.2d 343 (1975) (since both standing and ripeness concern whether plaintiff has suffered an actual or threatened injury, the doctrines bear "close affinity").
Generally, a plaintiff establishes standing by showing, among other things, an actual or threatened direct injury. In the First Amendment context, because of the serious consequences of "self-censorship," a plaintiff need not allege that he or she has already been punished under an allegedly unconstitutional statute. Rather, the plaintiff must show "a reasonable probability  not a certainty  of suffering tangible harm" unless he or she obtains the relief sought in the suit. Hoover v. Wagner, 47 F.3d 845, 847 (7th Cir.1995) (examples of "tangible harms" include arrest, prosecution, conviction, and "abandoning one's constitutional right of free *983 speech"). In cases seeking pre-enforcement review of a statute on First Amendment grounds, a "party has standing to challenge, pre-enforcement, even the constitutionality of a statute if First Amendment rights are arguably chilled, so long as there is a credible threat of prosecution." Chamber of Commerce of the United States v. Federal Election Comm'n, 69 F.3d 600, 603-04 (D.C.Cir. 1995) (emphasis in original) (citing Virginia v. American Booksellers Ass'n, 484 U.S. 383, 392-93, 108 S.Ct. 636, 642-43, 98 L.Ed.2d 782 (1988)); accord, Sequoia Books, Inc. v. Ingemunson, 901 F.2d 630, 634 (7th Cir.1990).
In Virginia v. American Booksellers, the Supreme Court concluded that plaintiffs had standing to bring a pre-enforcement challenge to a state statute because they had "alleged an actual and well-founded fear that the law will be enforced against them." 484 U.S. at 393, 108 S.Ct. at 643. The Court explained that "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." Id.; see also Barnett v. State of Wis. Ethics Bd., 817 F.Supp. 67, 69 (E.D.Wis.1993) ("In the First Amendment context, however, courts are less willing to refrain from adjudication for fear of the chilling effect on members of society that an unconstitutional statute may have."). Proof of the danger that a statute will have a "chilling effect" on a plaintiff's free speech is often alone enough to establish standing. As explained by the Supreme Court in Secretary of State of Md. v. Joseph H. Munson Co.:
Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole would then be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.
467 U.S. 947, 956, 104 S.Ct. 2839, 2847, 81 L.Ed.2d 786 (1984).
Here, plaintiffs have asserted an actual and well-founded fear that Ind.Code § 3-5-2-37 will be applied to them so that the County Election Board may bring enforcement proceedings against them. Although the County Election Board has not yet initiated any formal enforcement action against plaintiffs, Mr. Daily's letter of August 28, 1996, clearly indicated that an enforcement action may be forthcoming. The letter stated that plaintiffs' audio recording "appear[ed] to be an attempt to influence the election of a candidate" and advised plaintiffs to comply with the reporting requirements under the Indiana election laws if they had passed the $100 spending threshold. Further, it is undisputed that the statute is now preventing plaintiffs from engaging in issue advocacy, and that is a reasonable response to Mr. Daily's letter. Although Mr. Daily testified at the hearing that the County Election Board had no present intention to enforce the statute against plaintiffs, this does not deprive plaintiffs of standing to sue. Nothing prevents the County Election Board from enforcing the law at any time; thus, plaintiffs will likely refrain from engaging in their previous activities. See Chamber of Commerce, 69 F.3d at 603. Accordingly, plaintiffs have standing to challenge the constitutionality of the Indiana election laws to the extent they may regulate issue advocacy.
The ripeness doctrine is related to standing in that it seeks to discover whether a plaintiff is actually injured by a law. See Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 n. 3 (11th Cir.1991) ("Because both standing and ripeness analyses look to the existence of actual injury to the plaintiff caused by the alleged wrong, they overlap to some degree and often collapse into each other."). Insofar as there is a distinction, ripeness is concerned with timing  i.e., whether the plaintiff's threatened injury is sufficiently imminent to warrant judicial action. Regional Rail Reorganization Act Cases, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974) (ripeness is "peculiarly a question of timing"). Cases are not ripe where "parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." Hinrichs v. Whitburn, 975 F.2d *984 1329, 1333 (7th Cir.1992) ("In this regard, ripeness is closely related" to standing). As explained by the Supreme Court in Abbott Labs. v. Gardner, the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192 (1977). The Court directed district courts to consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515.
Both of these factors favor plaintiffs here. Where the issues before the court are primarily legal rather than factual  i.e., where further development of the factual record will neither avoid the need for the court to decide the legal issue nor substantially assist the court in resolving that issue  a case is more likely to be "fit" for judicial decision. See Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir.1995). Here, the issue is purely legal: Whether Ind.Code § 3-5-2-37 unconstitutionally regulates organizations engaged only in issue advocacy. As to the issue of hardship, the Supreme Court in Abbott Labs v. Gardner considered whether the challenged regulation directly impacted plaintiffs' day-to-day activities and the possible harms to the parties of delaying consideration. 387 U.S. at 153-54, 87 S.Ct. at 1517-18. Here, these considerations favor plaintiffs. Plaintiffs have shown that they have essentially suspended their operations in response to the County Election Board's inquiries. Also, because of the imminence of the next election, any further delay in deciding the merits of this case could irreparably harm plaintiffs' First Amendment rights. See Barker v. State of Wis. Ethics Bd., 815 F.Supp. 1216, 1219 (W.D.Wis.1993) (finding case ripe in part due to proximity of elections where plaintiff-lobbyists sought to volunteer personal services to candidates in violation of Wisconsin law).
In a free speech case asserting a pre-enforcement challenge to a law, a plaintiff whose speech has been chilled has already suffered a direct injury, further supporting a finding that the case is ripe for review. See, e.g., Planned Parenthood Ass'n of Chicago Area v. Kempiners, 700 F.2d 1115, 1122 (7th Cir.1983) (separate opinion of Cudahy, J.) ("Requirements of ripeness are less strictly construed in the first amendment context due to the chilling effect on protected expression which delay might produce."); Barnett, 817 F.Supp. at 69 (case is ripe where plaintiff has "an existing desire to address the legislature without having to worry about whether he will be prosecuted or otherwise penalized"). Plaintiffs' claim that the Indiana PAC definition extends to their efforts to engage in issue advocacy is ripe for review.[4]

2. Younger Abstention
Defendants contend in the alternative that if the case is ripe, it is because the County Election Board has commenced its proceedings against plaintiffs. Accordingly, defendants reason, the court should dismiss the suit under Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Generally, a federal court will not abstain from deciding a case within its jurisdiction. In Younger, the Supreme Court announced an exception to that principle, holding that absent extraordinary circumstances federal courts should abstain from interfering with ongoing state criminal proceedings. As explained *985 by the Seventh Circuit, the "core of the Younger doctrine is the proposition that a person who is being prosecuted by a state for violating its laws is not allowed to derail the prosecution by bringing a suit in federal court to enjoin the prosecution on the ground that the state statute on which it is based is unconstitutional." Hoover, 47 F.3d at 848. Although Younger itself applied only to criminal proceedings, the doctrine has been extended to other judicial or quasi-judicial proceedings that implicate important state interests. See, e.g., Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (state bar ethics committee proceedings). The Seventh Circuit has applied a three-part test to determine whether abstention under Younger is appropriate: (1) are the judicial or quasi-judicial proceedings ongoing; (2) do the proceedings implicate important state interests; and (3) is there an adequate opportunity in the state proceedings to raise constitutional challenges? Barichello v. McDonald, 98 F.3d 948, 955 (7th Cir.1996), citing Trust & Inv. Advisers, Inc. v. Hogsett, 43 F.3d 290, 295 (7th Cir.1994).
Younger abstention is inappropriate here because there is no "ongoing" proceeding. See Steffel v. Thompson, 415 U.S. 452, 461-62, 94 S.Ct. 1209, 1216-17, 39 L.Ed.2d 505 (1974). The state defendants' counsel admitted as much at the hearing. When asked for examples of situations under which plaintiffs' claims would have proceeded far enough as to be ripe for review but not so far as to be within the Younger doctrine, defendants' counsel offered two such examples: (1) where plaintiffs had spent $100 on issue advocacy, and (2) where plaintiffs had asserted a desire to spend $100 on issue advocacy in the future, but were chilled from doing so by the Indiana Code. Both of these situations accurately describe the facts in the record here. If plaintiffs had to wait until formal proceedings commenced against them, they could wait indefinitely, yet they could still suffer irreparable harm to their First Amendment rights in the meantime. Since no proceedings had begun at the time plaintiffs filed suit in federal court, the Younger abstention doctrine does not apply.

3. The Statutory Issue: Treating "Issue Advocacy" Organizations as PACs?
The dispute here is not over constitutional law. Plaintiffs and defendants agree that Indiana may not regulate as a political action committee an organization engaged solely in issue advocacy. Defendants correctly concede that if the definition of a political action committee in Ind.Code § 3-5-2-37 applied to BAPAC, at least as its activities are reflected in this record, the substantive requirements of Indiana law would be unconstitutional as applied. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); see also Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, ___ U.S. ___, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996).
Indiana Code § 3-5-2-37 includes within its definition of a "political action committee" an organization that: is not affiliated with a candidate's committee or a political party; "proposes to influence the election" of a candidate for state, legislative, local, or school board office or the outcome of a public question on the ballot; and accepts contributions or makes expenditures that exceed $100 in the aggregate during a calendar year to influence an election. The key phrase in dispute here  "proposes to influence the election of a candidate for a state, legislative, local, or school board office or the outcome of a public question"  appears in four places in § 37, in subsections (a)(1)(B), (a)(1)(C), (a)(4)(A), and (a)(4)(B).
Plaintiffs argue vigorously that the plain language of the statute renders it unconstitutional. First, the statutory language does not limit the definition of "political action committee" to organizations engaging in express advocacy. Instead of defining a PAC in terms of express advocacy, the statute uses the broad verb "influence." Relying on Black's Law Dictionary, plaintiffs argue that this use of "influence" makes the definition overly broad. Black's defines "influence" as: "To affect, modify or act upon by physical, mental or moral power, especially in some gentle, subtle and gradual way." Black's Law Dictionary 779 (6th ed. 1990). Issue advocacy, such as publicizing, praising, or *986 criticizing candidates' views on particular issues, is often intended to influence an election, at least in a subtle way, and plaintiffs assert that they in fact intended to influence primary elections through their issue advocacy.
Second, plaintiffs cite some of the abundant Indiana case law to the effect that courts must apply the plain language of a statute, despite perhaps strong policy or constitutional reasons to construe the statute in some other way. See, e.g., Indiana Dep'. of State Revenue v. Horizon Bancorp, 644 N.E.2d 870, 872 (Ind.1994); Office of Utility Consumer Counselor v. Public Service Co. of Indiana, 608 N.E.2d 1362, 1363-64 (Ind. 1993); Grody v. State, 257 Ind. 651, 278 N.E.2d 280, 285 (1972). Plaintiffs contend that the legislature's use of the broad term "influence" means that the plain language of the statute reaches organizations that engage solely in issue advocacy. Interpretation of statutes can involve delicate issues in the separation of the legislative and judicial powers, especially when the courts must interpret statutes in the context of a constitutional challenge. See A Woman's Choice  East Side Women's Clinic v. Newman, 671 N.E.2d 104, 106-07 (Ind.1996) (plurality opinion of Shepard, C.J.). The Supreme Court of the United States said, when asked to save a statute by stretching statutory language beyond the breaking point: "[T]his Court will not consider the abstract question of whether Congress might have enacted a valid statute but instead must ask whether the statute that Congress did enact will permissibly bear a construction rendering it free from constitutional defects." Aptheker v. Secretary of State, 378 U.S. 500, 515, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964). The Supreme Court of Indiana followed Aptheker and refused a similar invitation to save a statute by "construction" that would have amounted to judicial rewriting precisely because of concern about the separation of powers. The court left the rewriting of the statute to the legislature. Grody v. State, 278 N.E.2d at 285.
Third, plaintiffs make a very practical argument. The language of the statute is available to citizens like Mr. Patten in public libraries and elsewhere. Where the statute uses overly broad language that would cause a reasonable reader to refrain from engaging in protected speech, plaintiffs suggest, the courts should not try to "cure" that problem with a judicial "gloss" that would not be as readily available to a citizen like Mr. Patten. Before spending money to discuss public issues, average citizens should not be required to consult a lawyer expert in the First Amendment and campaign finance laws to be assured that the statutory language does not mean what it appears to mean. Accordingly, plaintiffs conclude, the Indiana definition of a political action committee is unconstitutionally overbroad.
If this case had come to this court on a clean slate, these arguments might have had considerable force. Upon first reading, the term "influence" appears to render the definition of a PAC quite broad. Similarly, the difference between speech intended to "influence" an election and speech that "in express terms advocate[s] the election or defeat of a clearly identified candidate," see Buckley, 424 U.S. at 44, 96 S.Ct. at 646-47, is a larger difference than the Indiana courts ordinarily are willing to bridge as a matter of interpretation of statutes. Also, especially in legislation affecting political speech  the very core of the free speech and free press clauses of the First Amendment  it seems reasonable for courts to require legislatures to say what they mean so that a citizen need not consult a lawyer to be told that the speech the statute appears to prohibit is not actually prohibited when the correct judicial "gloss" is applied.
In this case, however, the slate is far from clean. Indiana's definition of "political action committee" and the corresponding reporting requirements virtually mirror language from the Federal Election Campaign Act of 1971 ("FECA") that the Supreme Court construed narrowly and found to be constitutional in Buckley v. Valeo. The FECA defined "political action committees" as groups receiving "contributions" or making "expenditures" of over $1000 in a calendar year. Buckley, 424 U.S. at 62, 96 S.Ct. at 655. The FECA then defined "contributions" and "expenditures" by focusing on the use of money "for the purpose of ... influencing" the nomination *987 or election of a candidate for federal office. Id. at 63, 96 S.Ct. at 655 (emphasis added). The FECA also imposed reporting and disclosure requirements on PACs and individuals that carried criminal penalties for noncompliance. Id. at 64, 96 S.Ct. at 656. The Supreme Court said that the language, "for the purpose of ... influencing" could "encompass both issue discussion and advocacy of a political result." Id. at 79, 96 S.Ct. at 663. However, to ensure that the FECA's reporting and disclosure requirements were not unconstitutionally broad, the court narrowly construed the statute:
In summary, § 434(e), as construed, imposes independent reporting requirements on individuals and groups that are not candidates or political committees only in the following circumstances: (1) when they make contributions earmarked for political purposes or authorized or requested by a candidate or his agent, to some person other than a candidate or political committee, and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.
424 U.S. at 80, 96 S.Ct. at 664.
The Indiana statute must be understood and construed against the background of the FECA, Buckley, and their apparent effects on the drafting of the Indiana statute. The key language in the Indiana Code can be traced to Public Law No. 6-1976, enacted February 25, 1976, about four weeks after Buckley was decided on January 30, 1976. Public Law 6-1976 added a new article to the Indiana Code dealing with political contributions and expenditures. It defined a "political committee" to include candidate and party committees, as well as "any other person who accepts contributions or makes expenditures during a calendar year in an aggregate amount exceeding one hundred dollars ($100)." Ind.Code § 3-4-1-16 (1981). In turn, "person" was defined very broadly to include "individuals, business organizations, labor organizations, religious organizations, political organizations, trustees, receivers and any other organization, association, cooperative or group of persons whatsoever." Ind.Code § 3-4-1-15 (1981). As in the FECA, in the Indiana legislation the critical language for present purposes was in the definitions sections:
As used in this article, "contribution" means:
(a) a gift, subscription, loan, advance, or deposit of money or anything of value, made for the purpose of influencing the nomination, or election, of any person to office, or for the purpose of influencing the outcome of any question; or for the purpose of influencing the election of delegates to a constitutional convention for proposing amendments to the constitution of the state of Indiana.
* * * * * *
As used in this article, "expenditure" means:
(a) a purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made for the purpose of influencing the nomination or election, of any person to office, or for the purpose of influencing the outcome of any question; or for the purpose of influencing the election of delegates to a constitutional convention for proposing amendments to the constitution of the state of Indiana.
Ind.Code §§ 3-4-1-6(a), -10(a) (1981) (emphasis added). The parallels to the FECA interpreted by the Supreme Court of the United States in Buckley v. Valeo are strong and obvious.[5]
Against the background of Buckley v. Valeo and this statutory history, plaintiffs' plain language argument has less force than it would otherwise have. The Supreme Court of Indiana has often noted its preference for interpreting Indiana statutes in ways that *988 will render them constitutional where the language will reasonably bear such construction. E.g., Burris v. State, 642 N.E.2d 961, 968 (Ind.1994); Brady v. State, 575 N.E.2d 981, 984-85 (Ind.1991); Miller v. State, 517 N.E.2d 64, 71 (Ind.1987). In a recent case involving interpretation of another Indiana statute in light of serious constitutional issues, the Supreme Court of Indiana explained:
The rules or maxims of construction are flexible aids to the search for meaning. Highland Sales Corp. v. Vance, 244 Ind. 20, 26, 186 N.E.2d 682, 685 (1962). They also cover certain broader jurisprudential considerations, including the separation of powers doctrine. Accordingly, if the present questions came to us via our regular appellate jurisdiction, we would construe the exception in a constitutional manner insofar as the statutory language would permit. Brady v. State, 575 N.E.2d 981, 984 (Ind.1991).
A Woman's Choice  East Side Women's Clinic v. Newman, 671 N.E.2d at 107 (plurality opinion of Shepard, C.J.). In A Woman's Choice, the plurality explained that the court would not hold a statute unconstitutional so long as a reasonable construction of the statute would render it constitutional. Id. at 110-11, citing Burris v. State, 642 N.E.2d at 968. Justice Dickson, concurring in the result, based his decision to interpret the statute on "our overriding obligation to construe our statutes in such a way as to render them constitutional if reasonably possible." Id. at 111.
In determining whether defendants' proposed construction of the definition of a PAC is appropriate here, another significant principle in statutory construction also comes into play. At least as a general rule, when the legislature adopts language from other jurisdictions, it is presumed that the legislature intends to adopt judicial constructions of that language as well. See Pittsburgh, Cincinnati, Chicago & St. Louis R.R. v. Parker, 191 Ind. 686, 695, 132 N.E. 372, 375 (1921); In re Marriage of Hudson, 434 N.E.2d 107, 113 (Ind.App.1982); accord, Moses v. Cober, 641 N.E.2d 668, 670-71 (Ind.App.1994) (when legislature acts, it is presumed to know history of an act and court decisions interpreting it). This same general presumption applies in interpretation of federal statutes. See Carolene Prods. Co. v. United States, 323 U.S. 18, 26, 65 S.Ct. 1, 5, 89 L.Ed. 15 (1944). The strength of the presumption "varies in strength with the similarity of the language, the established character of the decisions in the jurisdiction from which the language was adopted, and the presence or lack of other indicia of intention." Id.
These factors make this a strong case for presuming that the Indiana legislature intended to adopt the federal construction in Buckley v. Valeo. First, in both the 1976 legislation and the 1986 recodification, the Indiana legislature used the same material language from the FECA in crafting the Indiana election laws. Second, the "established character of the decisions in the jurisdiction from which the language was adopted" was as strong as one can find. Just weeks before enactment of the Indiana legislation in 1976, the Supreme Court of the United States had announced the definitive construction of the federal legislation. Third, the parties have offered no contrary indications of legislative intent, and the court has found none.[6]
*989 Whenever a state tries to defend the constitutionality of a statute by proposing a particular construction, the first question is whether the language will reasonably support that construction. Plaintiffs describe the constitutional interpretation of the Indiana statute as a "somewhat disingenuous construction." Pl. Reply Br. at 9. However, the Supreme Court of the United States has not only held that the material language at issue in this case can bear the constitutional interpretation but has given that language the definitive interpretation as a matter of federal law. That interpretation is identical to the interpretation suggested by the defendants here. In light of Buckley v. Valeo, the constitutional interpretation is not an unreasonable or "somewhat disingenuous" construction of the material language about "influencing" elections.
Similarly, Buckley v. Valeo undermines plaintiffs' argument that the practical consequences of overly broad statutes regulating political speech cannot be remedied completely by judicial constructions that are less accessible to citizens. The Supreme Court of the United States held that such a narrowing construction of statutory language was the appropriate way to read the federal statute.[7] The Buckley decision makes it difficult for a district court to reject as unfair or unreasonable a similar solution to problems posed by a state statute. The most this court can do to cure the notice problem is publish this opinion construing the statute so that the opinion will be noted in annotated versions of the Indiana Code, which are widely available.
For all these reasons, this court concludes that it is highly likely that the Indiana courts would interpret Indiana's definition of "political action committee" in Ind.Code § 3-5-2-37 to be triggered only by contributions or expenditures used for communications that in express terms advocate the election or defeat of a clearly identified candidate for office or the victory or defeat of a public question. See Buckley, 424 U.S. at 44 & n. 52, 96 S.Ct. at 647 & n. 52. Under that narrow construction of the "influencing elections" language, the Indiana statute stays within the permissible constitutional limits on reporting and disclosure requirements as applied in Buckley v. Valeo. Accordingly, plaintiffs do not have a reasonable likelihood of success on the merits of their claim that the statute extends to organizations engaged only in "issue advocacy." Plaintiffs therefore fail to meet the criteria for issuance of a preliminary injunction in this case. Abbott Labs., 971 F.2d at 11.
Defendants have argued in the alternative that, even if the court did not agree with their interpretation of the definition of PAC in Ind.Code § 3-5-2-37, the court should still invoke the doctrine of Pullman abstention to refrain from deciding whether § 3-5-2-37 is constitutional, and should stay these proceedings while allowing the Indiana courts to address the correct interpretation of the statute. Under Railroad Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), a federal court may abstain "where a federal constitutional issue might be mooted or presented in a different posture if a pertinent state law issue which is currently undecided were to be resolved in a particular way." E & E Hauling, Inc. v. Forest Preserve Dist. of DuPage County, 821 F.2d 433, 436 (7th Cir.1987). Pullman abstention promotes comity between federal and state governments by directing federal courts not to decide the constitutionality of state statutes before state courts have had a fair opportunity to resolve disputed issues of state law that would affect the constitutional issue. See Mazanec v. North Judson-San Pierre Sch. Corp., 763 F.2d 845, 847 (7th Cir.1985). Where a federal court faces a decision about the constitutionality of a state statute, there are two prerequisites for abstaining under Pullman: (1) an unclear statutory provision that (2) is "fairly susceptible" to an interpretation that would avoid or substantially alter the constitutional issue. Kusper v. Pontikes, 414 U.S. 51, 54-55, 94 S.Ct. 303, 306-07, 38 L.Ed.2d 260 (1973); Panhandle Eastern Pipe Line Co. v. Madison County *990 Drainage Bd., 898 F.Supp. 1302, 1310 (S.D.Ind.1995). If the state statute is either unambiguous or not susceptible to a construction that would avoid the federal constitutional issue, abstention is not appropriate. See Ryan v. State Bd. of Elections of the State of Ill., 661 F.2d 1130, 1136 (7th Cir. 1981) ("Where state law is unambiguous Pullman abstention is inapposite.").
Pullman abstention is not appropriate here. The Indiana definition of a PAC in Ind.Code § 3-5-2-37 is reasonably susceptible either to a broad and unconstitutional reading or to a narrow and constitutional reading. For the reasons explained above, however, the court believes it is highly likely that Indiana courts would take the same approach to the critical "influencing elections" language that the Supreme Court of the United States took in interpreting essentially identical language in the FECA. The court is sufficiently confident of that conclusion that no purpose would be served by subjecting the parties to the expense and delay, and the state courts to the additional work, that would be caused by abstaining in this case. The primary purpose of Pullman abstention, after all, is to promote comity between federal and state governments by preventing federal courts from prematurely striking down state statutes that could be saved by an authoritative state court interpretation. See Mazanec, 763 F.2d at 847 ("The main purpose of the Pullman doctrine is to avoid, if possible, declaring a state statute unconstitutional, by giving the state courts a chance to interpret it narrowly."); Waldron v. McAtee, 723 F.2d 1348, 1352 (7th Cir.1983) ("A federal court should not place itself in the position of holding the statute unconstitutional by giving it the [broader] construction, only to find that the highest court of the state will render the decision futile and unnecessary by adopted the [narrower]."). That purpose would not be served in this case.
Plaintiffs point out correctly that this court's construction of the statute does not bind the state courts. They express fear that they may still be subject to enforcement proceedings, perhaps by some other county election board or prosecuting attorney. Plaintiffs argue that this uncertainty requires this court to declare the statute unconstitutional and to enjoin its enforcement. This argument turns Pullman abstention on its head. It would require the federal courts to enjoin enforcement of state statutes that are merely susceptible to unconstitutional interpretations, regardless of the actual danger that the state courts would actually read them that way. Suffice it to say that if plaintiffs' fear of future prosecution based on an obviously unconstitutional interpretation of the statute is in fact genuine, then plaintiffs may seek relief  and a definitive interpretation of the statute  in the state courts. In that case, if it ever came to pass, the parties and state courts would be subject only to the same additional expense, delay, and work that would result from a decision by this court to abstain at this time. The remote possibility that the state courts might choose to interpret this statute in an unconstitutional manner could not justify a decision by this court to disregard the readily available limiting construction and to enjoin enforcement of the statute on federal constitutional grounds.

B. The "Major Purpose" Test
Plaintiffs also challenge the definition of "political action committee" in Ind.Code § 3-5-2-37 on a separate basis. Plaintiffs argue that under Buckley v. Valeo, an organization that expressly advocates the election or defeat of a clearly identified candidate may be subjected to reporting and disclosure requirements as a PAC only if the organization either is under the control of a candidate or the organization's "major purpose" is the nomination, election, or defeat of candidates for office. The "major purpose" test derives from the following language in Buckley v. Valeo:
Although the phrase, "for the purpose of ... influencing" an election or nomination, differs from the language used in § 608(e)(1), it shares the same potential for encompassing both issue discussion and advocacy of a political result. The general requirement that "political committees" and candidates disclose their expenditures could raise similar vagueness problems, for "political committee" is defined only in *991 terms of amount of annual "contributions" and "expenditures," and could be interpreted to reach groups engaged purely in issue discussion. The lower courts have construed the words "political committee" more narrowly. To fulfill the purposes of the Act they need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. Expenditures of candidates and of "political committees" so construed can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.
Buckley, 424 U.S. at 79, 96 S.Ct. at 663 (footnotes omitted). In Federal Election Commission v. Massachusetts Citizens for Life, Inc., the Court reaffirmed the "major purpose" language in Buckley, commenting that "an entity subject to regulation as a `political committee' under the Act is one that is either `under the control of a candidate or the major purpose of which is the nomination or election of a candidate.'" 479 U.S. 238, 253 n. 6, 107 S.Ct. 616, 625 n. 6, 93 L.Ed.2d 539 (1986) (quoting Buckley, 424 U.S. at 79, 96 S.Ct. at 663).
The major purpose test appears to have been litigated less frequently than the express advocacy/issue advocacy dichotomy, and its scope remains uncertain. Plaintiffs in this case argue that the test is limited to a measure of the organization's expenditures, so that an organization that spends 50.1 percent of its funds on issue advocacy and 49.9 percent of its funds on express advocacy does not have the "major purpose" of influencing the outcome of elections and therefore is not a political action committee subject to disclosure and reporting requirements. Plaintiffs have not cited any case law holding that such a mechanical test is mandated by the First Amendment, the FECA, or Buckley v. Valeo. However, Judge Oberdorfer has observed that the "major purpose" of an organization may be shown by its public statements of purpose or by other means, including its expenditures in cash or in kind for the benefit of particular candidates. Federal Election Comm'n v. GOPAC, Inc., 917 F.Supp. 851, 859 (D.D.C.1996).
The major purpose test raises difficult constitutional questions. In Buckley, the Supreme Court suggested, but nevertheless appears to have stopped short of holding, that the "major purpose" test is constitutionally required. See 424 U.S. at 78-80, 96 S.Ct. at 663-64 (construing federal statute to avoid constitutional issue, without indicating precise constitutional limits). Assuming the "major purpose" test is constitutionally required, its application can be troubling. For example, under plaintiffs' version of the major purpose test, an organization that spends $100,000 in a year on express advocacy may be regulated as a PAC. But another organization  for the sake of argument, let's suppose its views are diametrically opposed to those of the first organization  could spend $200,000 in a year on issue advocacy and $100,000 on express advocacy. Under plaintiffs' view of the major purpose test, the First Amendment requires that the two organizations be regulated differently, so that only the first may constitutionally be regulated as a PAC, so that its contributors and expenditures would be identified in public records, while its opponent could not be subjected to those requirements. (In Buckley and Federal Election Commission v. Massachusetts Citizens for Life, however, the Supreme Court indicated that it would probably be permissible to require the second organization to identify contributors and expenditures for the express advocacy. See Buckley, 424 U.S. at 79-80, 96 S.Ct. at 663-64; Massachusetts Citizens for Life, 479 U.S. at 252 & n. 6, 107 S.Ct. at 624-25 & n. 6 (plurality opinion), and at 265-66, 107 S.Ct. at 631-32 (O'Connor, J., concurring).) Similarly, plaintiffs' version of the major purpose test would make the constitutional issue in some cases turn on the choice of the correct accounting period for measuring the "majority" of an organization's expenditures. (It is easy to imagine that an organization engaged in both issue advocacy and express advocacy might devote most of its expenditures in the months before an election to express advocacy, while an annual accounting might show a majority of expenditures for issue advocacy). Plaintiffs' version of the major purpose test would also make the constitutional issue in other cases turn on the fine points of accounting *992 for and allocating common overhead costs between express advocacy and issue advocacy efforts.
This court need not attempt to resolve these issues at this time and in this case. As discussed above, plaintiffs have standing to challenge application of Indiana's PAC regulations to organizations that engage in issue advocacy, and that issue is ripe for adjudication. That conclusion does not mean, however, that plaintiffs also have standing to challenge application of those PAC regulations to organizations that engage in express advocacy, but that do not have as their "major purpose" the election or defeat of identified candidates. Standing and ripeness are questions that must be considered on a claim-by-claim basis. See, e.g., Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983) (plaintiffs' challenge to one provision in state statute was ripe but challenge to another provision was not); City of Los Angeles v. Lyons, 461 U.S. 95, 111-13, 103 S.Ct. 1660, 1670-71, 75 L.Ed.2d 675 (1983) (plaintiff had standing to assert claim for damages but not for injunction); Marshall & Ilsley Corp. v. Heimann, 652 F.2d 685, 693 (7th Cir.1981) (applying the "zone of interests" portion of the standing analysis "separately to each count and each statute involved").
The record here shows that plaintiffs BAPAC and Patten have not engaged in express advocacy and that they do not wish or intend to do so. For the reasons discussed above, plaintiffs are not subject to regulation as a PAC because the Indiana definition does not reach organizations engaged only in issue advocacy. To show standing to bring a pre-enforcement challenge to a statute, a plaintiff must show both an intention to engage in a course of conduct unconstitutionally prohibited by the statute and a credible threat of prosecution or enforcement. Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308-09, 60 L.Ed.2d 895 (1979); accord, e.g., Schmidling v. City of Chicago, 1 F.3d 494, 499-500 (7th Cir.1993) (collecting cases); American Library Ass'n v. Barr, 956 F.2d 1178, 1196 (D.C.Cir.1992); McCollester v. City of Keene, 668 F.2d 617, 620 (1st Cir.1982) ("An allegation as to what the plaintiff personally intends to do is necessary to show that not only she but also her intended conduct are at least plausibly within the potential reach of the statute or ordinance."). In the absence of at least a clear desire to engage in express advocacy that is being chilled by the absence of "major purpose" language limiting the Indiana definition of a PAC, the "major purpose" arguments raised by plaintiffs are an invitation to adjudication in the abstract.
Plaintiffs rely extensively on International Soc'y for Krishna Consciousness of Atlanta v. Eaves, 601 F.2d 809 (5th Cir.1979), to support their argument concerning standing. In Eaves, the Fifth Circuit held that the International Society for Krishna Consciousness had standing to bring a facial challenge to a municipal ordinance regulating the distribution of literature at airports, even though the statute had never been enforced. Eaves, however, dealt primarily with the "credible threat of enforcement" prong of the standing analysis. 601 F.2d at 820-23. In Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756 (11th Cir. 1991), the Eleventh Circuit distinguished Eaves on grounds highly relevant to Count II of plaintiffs' complaint here. In Hallandale, the plaintiff-union sought to challenge the constitutionality of the defendant's policy establishing guidelines for criticism of city officials by city employees. The Hallandale court explained that in Eaves, the plaintiff's alleged "desire and intent to engage in the prohibited behavior was specific, serious, and plausible," and thus the plaintiff had standing despite the absence of enforcement. 922 F.2d at 762. By contrast, the Eleventh Circuit explained, the plaintiff in Hallandale "never says that its members intend to violate the policy or to behave in a way that would arguably violate the policy. More important, the Union tells us nothing specifically about what it says that its members might want to do or say that might be protected by the first amendment but might be chilled by the existence of the city's policy. We are left to hypothesize and to speculate about possible harms that might or might not occur, and this we cannot do." Id. (emphasis in original). Accord, United Pub. Workers of Am. *993 v. Mitchell, 330 U.S. 75, 89-90, 67 S.Ct. 556, 564-65, 91 L.Ed. 754 (1947) (plaintiff union had no standing to challenge Hatch Act, which disallowed certain political activities by city employees, because plaintiffs did not specifically allege the types of political activity they desired to engage in). With respect to BAPAC's "major purpose" argument, this case is like Hallandale, and not like Eaves.
These plaintiffs have not shown that the absence of the major purpose language in the Indiana statute is having any effect on their activities. Accordingly, there is no ripe actual case or controversy between these plaintiffs and the defendants as to the major purpose issue.

Conclusion
When Indiana's definition of a "political action committee" is properly interpreted, it does not apply to an organization like BAPAC, which has engaged, and wishes to engage, only in issue advocacy. Accordingly, the definition and the substantive requirements triggered by it do not violate these plaintiffs' rights under the free speech clause of the First Amendment. Plaintiffs are therefore unlikely to succeed on the merits of their constitutional challenge to Ind.Code § 3-5-2-37 on the theory that it treats issue advocacy groups as political action committees. Plaintiffs do not have standing to challenge the statute on the theory that it could be applied to groups that engage in "express advocacy" but do not have such advocacy as their major purpose. Plaintiffs' motion for preliminary injunction is therefore denied.
So ordered.
NOTES
[1] In this opinion, defendants Baldwin, Carter, Mallamad, Morgan, Perkins, and Cruea, who are represented by the Office of the Attorney General of Indiana, are referred to as the "state defendants." Defendants Daily, Lawson, and Starnes, members of the Hendricks County Election Board, are referred to as the "county defendants."
[2] Plaintiffs' answers to interrogatories in this case state that the flyer attached as an exhibit to their verified complaint was an example of about 4,000 flyers that BAPAC produced and distributed at a cost of about $250.
[3] The portion of Buckley that dealt with reporting and disclosure requirements stopped just short of saying that its construction of the applicable statutes  limiting the requirements to express advocacy  was constitutionally required. That portion of the opinion was framed instead in terms of interpreting statutes to avoid potential constitutional problems. See 424 U.S. at 78-80, 96 S.Ct. at 663-64. More recently, the Supreme Court has indicated that some forms of reporting or disclosure requirements might be able to survive constitutional scrutiny even as applied to issue advocacy. See McIntyre v. Ohio Elections Comm'n, ___ U.S. ___, ___ _ ___, 115 S.Ct. 1511, 1521-22, 131 L.Ed.2d 426 (1995) (limited requirement that author of pamphlet be identified might survive First Amendment scrutiny); id. at ___, 115 S.Ct. at 1524 (Ginsburg, J., concurring); id. at ___, 115 S.Ct. at 1535 (Scalia, J., dissenting). However, the Indiana election laws at issue in this case require statutory interpretation, not an exploration of the constitutional boundary for regulating issue advocacy.
[4] The state defendants have not taken any affirmative steps toward enforcing the PAC laws against the plaintiffs. At this point, however, plaintiffs' claim is that the very existence of the state statute is chilling their exercise of free speech rights. In a pre-enforcement challenge under the First Amendment, the plaintiffs' claims can be ripe if the statute, when combined with a reasonable fear of enforcement, is having an effect on plaintiffs now. In this case, it is. In addition, under the Indiana election code, if the County Election Board proceeded further against the plaintiffs, it could refer the matter to either the Attorney General or the prosecuting attorney, and the Indiana Election Commission could undertake its own enforcement efforts. See statutes cited above at pages 6-7. Finally, the Attorney General has made it clear that, even if the claims against her and other state officials were not ripe, she would want to intervene under 28 U.S.C. § 2403(b) to defend the constitutionality of the state statute.
[5] These provisions of the 1976 Indiana legislation were repealed as part of sweeping recodification of Indiana election laws in 1986. Public Law 5-1986 enacted the current structure of the election code, which, although often amended, continues to use the critical "influence" language in Ind.Code § 3-5-2-37. In turn, the 1976 legislation had repealed and replaced Indiana campaign finance legislation dating from 1945, which had used the phrase "to aid or take part in the nomination or election of any candidate for public office." Ind.Code 3-1-30-2 (1972) (definition of "political committee" from Elections Code of 1945).
[6] The last two of these factors were not present in A Woman's Choice and made the statutory interpretation issues in that case more involved than the questions in this case. In A Woman's Choice, which involved the scope of a health exception to a statute regulating abortions, the federal court decisions in question could not provide definitive interpretations of the state statutes they had discussed. Moreover, in that case evidence from both the evolution of the bill through the legislature and from the floor debates indicated that the legislature did not intend to adopt the federal courts' interpretation of a similar Pennsylvania statute. Compare 671 N.E.2d at 109-10 (plurality opinion) and id. at 111-12 (Dickson, J., concurring in judgment), with id. at 112-13 (Sullivan J., dissenting in part), and id. (Selby, J., dissenting in part). In fact, before certifying the questions that the Supreme Court of Indiana answered in its opinions, this court had concluded on a preliminary basis that those factors were sufficient to show that the Indiana legislature intended the statute to have an unconstitutional scope. See A Woman's Choice  East Side Women's Clinic v. Newman, 904 F.Supp. 1434, 1470-72 (S.D.Ind.1995) (tracing legislative history of key language).
[7] In fact, the Supreme Court in Buckley explained that its distinction between express advocacy and issue advocacy was intended to ensure that citizens would have fair notice of the scope of the law. See 424 U.S. at 41-44 & n. 48, 96 S.Ct. at 645-47 & n. 48; id. at 76-77, 96 S.Ct. at 662-63.