# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**LINDA L. PENCE**
**DAVID J. HENSEL**
Pence Hensel LLC
Indianapolis, Indiana

**KATHRINE D. JACK**
Law Office of Kathrine Jack
Greenfield, Indiana

ATTORNEYS FOR *AMICUS CURIAE*

Organizations and Individuals Committed
To Education and Treatment for Perinatal
Psychiatric Illness
**MONICA FOSTER**
Indianapolis, Indiana

**JULIE CANTOR, MD, JD**
Santa Monica, California

Legal Voice and Perinatal Loss Support
Organizations and Experts
**JENNIFER LUKEMEYER**
Voyles, Zahn, Paul, Hogan & Merriman
Indianapolis, Indiana

American Association of Suicidology, et al
**JENNIFER GIROD**
Hall, Render, Killian, Heath & Lyman, P.C.
Indianapolis, Indiana

**DAVID ORENTILICHER**
Indianapolis, Indiana

National Organization for Women, Law Students
For Reproductive Justice, National Women's Law
Center, and Sistersong Women of Color Justice
Collective
**SANDRA L. BLEVINS**
BETZ + BLEVINS
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ELLEN H. MEILAENDER**
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 08 2012, 10:07 am

CLERK
of the supreme court,
court of appeals and
tax court

**JILL C. MORRISON**
National Women's Law Center
Washington, DC

American Civil Liberties Union Indiana and
American Civil Liberties Union
**GAVIN M. ROSE**
American Civil Liberties Union Foundation
Indianapolis, Indiana

**ALEXA KOLBI-MOLINAS**
American Civil Liberties Union Foundation
New York, New York

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BEI BEI SHUAI, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1106-CR-486 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Sheila A. Carlisle, Judge
Cause No. 49G03-1103-MR-14478

**February 8, 2012**

**OPINION – FOR PUBLICATION**

**MAY, Judge**

2

Bei Bei Shuai appeals the denial of her motion for bail and writ of *habeas corpus* ("the Bail Appeal") and the denial of her motion to dismiss the charges against her ("the Dismissal Appeal"). She raises numerous issues,[1] two of which we find dispositive:

1.      Whether the trial court abused its discretion when it denied Shuai bail because the proof was evident and presumption was strong that she committed murder; and

2.      Whether the trial court erred when it denied Shuai's motion to dismiss.

We reverse in part, affirm in part, and remand.

## FACTS AND PROCEDURAL HISTORY

In December of 2010, Shuai was in the third trimester of a pregnancy that allegedly was the product of an affair with a married man, Zhiliang Guan. Guan broke off his relationship with Shuai that month, and she became distraught. Around the middle of the

---

[1] Although we need not address them herein, the other issues raised by Shuai include the following:
    <u>Issues Presented in Both Appeals</u>
        1.        Whether the language of Indiana's murder and feticide statutes is ambiguous;
        2.        Whether Indiana's murder statute is unconstitutional because it:
                a.      is void for vagueness;
                b.      violates Shuai's due process rights;
                c.      violates Shuai's right to equal protection; and
                d.      subjects Shuai to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article 1, Section 16 of the Indiana Constitution.
        3.        Whether Shuai's actions constitute a crime; and
        4.        Whether the State's charging information is deficient.
    <u>Issues Presented only in Bail Appeal</u>
        1.        Whether the State illegally seized Shuai's medical records;
        2.        Whether the evidence the State used to demonstrate the cause of A.S.'s death was admissible under the test for expert testimony as set forth in *Daubert v.Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); and
        3.        Whether the State presented sufficient evidence Shuai acted with malicious intent.
    <u>Issue Presented only in Dismissal Appeal</u>
        1.        Whether Indiana's murder statute unconstitutionally violates Shuai's right to privacy.

month, Shuai researched ways to commit suicide and decided she would ingest rat poison.

On December 21, Shuai bought rat poison. On December 23, when Shuai was thirty-three weeks pregnant, she wrote Guan, saying she felt she and the fetus were a burden on Guan, she had resolved to kill herself, and she was "taking this baby, the one you named Crystal, with [her]." (State's Ex. 25 & 26.) Shuai then ingested rat poison. Shuai called Guan and told him she had ingested rat poison and was going to die.

Later that day, an anonymous caller asked police to conduct a welfare check on Shuai. When the officer arrived, Shuai insisted she was fine and asked the officer to leave. She then went to the nearby home of her friend, Bing Mak. Mak noticed Shuai was acting strangely, but Shuai insisted nothing was wrong. Finally, Shuai admitted she had taken rat poison, and Mak took Shuai to the hospital for treatment.

On December 24, Shuai was transferred to Methodist Hospital. After she and the fetus were stabilized at Methodist, the doctors gave Shuai a steroid used to improve post-birth lung functioning of children who are born prematurely. Shuai immediately began having mild contractions, and doctors gave her indomethacin to stop the contractions.

On December 31, Dr. Claire Bernardin, an obstetrician, observed an unusual fetal heart rate and advised Shuai the fetus needed to be delivered immediately via caesarean section. Shuai consented, and the doctor delivered via caesarean section an infant Shuai named A.S. Hospital staff immediately transferred A.S. to the neonatal intensive care unit (NICU).

While in the NICU, doctors found A.S. had a high International Normalized Ratio (INR), which indicated her blood could not clot. An ultrasound revealed A.S. had a bilateral Grade III intraventricular hemorrhage.[2] A.S.'s condition steadily worsened. On January 3, 2011, Shuai consented to removing A.S. from life support, and A.S. died. Dr. Jolene Clouse, the forensic pathologist who performed A.S.'s autopsy, indicated on the coroner's verdict report that A.S. died of "intracerebral hemorrhage due to maternal Coumadin[3] ingestion[.]" (Defendant's Ex. B.)

Shuai was released from the Methodist Psychiatric Unit on February 4, 2011, and returned to live with Mrs. Mak. On March 14, the State charged Shuai with murder, a felony,[4] and Class B felony attempted feticide,[5] and Shuai turned herself in on the same day. On March 22, Shuai filed a petition for reasonable bail and writ of *habeas corpus*, and on March 30, Shuai filed a motion to dismiss the charges against her.

The trial court held a hearing on her bail petition and denied it on June 6. It denied the motion to dismiss on June 20. On June 27, the trial court certified both orders for interlocutory appeal. We accepted jurisdiction on August 15. On Shuai's motion, we

---

[2] An intraventricular hemorrhage is "bleeding inside or around the ventricles, the spaces in the brain containing cerebral spinal fluid." *Intraventricular Hemorrhage*, http://www.lpch.org/DiseaseHealthInfo/HealthLibrary/neuro/ivh.html (last accessed December 27, 2011). "Bilateral" indicates the hemorrhage affected "the right and left members" of the brain. *Bilateral – Medical Definition*, http://www.merriam-webster.com/medical/bilateral (last accessed December 27, 2011).

[3] Coumadin, hydroxycoumarin, and brodifacoum are variants of the anticoagulant warfarin, which can be found in rat poison. (*See* Tr. at 75 (". . .the mother had ingested Coumadin - - the rat poison").) (*See also Id*. at 87-88 ("[Defense]: Now, are you aware that rat poisoning no longer has coumarin in it? [Clouse]: I believe it has hydroxycoumarin. [Defense]: And does that go by other names? [Clouse]: Yeah, I believe it's brodifacoum – or brodifacoum.").) *See also* "Coumadin Oral" at http://www.webmd.com/drugs/drug-4069-Coumadin+Oral.aspx?drugid=4069&drugname=Coumadin+Oral&source=1 (last accessed December 27, 2011).

[4] Ind. Code § 35-42-1-1.

ordered the Bail Appeal expedited. After examination of the Bail Appeal briefs, it became

apparent the issues likely to be presented in the Dismissal Appeal would overlap significantly

with those in the Bail Appeal. We accordingly reconsolidated the two appeals *sua sponte* and

granted Shuai's request for oral argument.[6]

## DISCUSSION AND DECISION

1.      Denial of Bail

Article 1, Section 17 of the Indiana Constitution recognizes the right to bail:

"Offenses, other than murder and treason, shall be bailable by sufficient sureties. Murder or

treason shall not be bailable, when the proof is evident, or the presumption is strong."

Indiana Code § 35-33-8-2(a) echoes that constitutional provision: "Murder is not bailable

when the proof is evident or the presumption strong. In all other cases, offenses are

bailable." That language has been interpreted to imply a presumption that bail should not be

granted in a murder case. *Bozovichar v. State*, 230 Ind. 358, 366, 103 N.E.2d 680, 683

(1952). "The burden is on the applicant to show that the proof is not evident or the

presumption of guilt [not] strong." *Id.* Thus, Shuai was required to demonstrate the State's

proof that she "did knowingly kill a fetus that had attained viability, namely: voluntarily

ingested rat poison when approximately thirty-three (33) weeks pregnant causing [A.S.] to be

---

[5] Ind. Code § 35-42-1-6 (feticide); Ind. Code § 35-41-5-1.
[6] We held oral argument in the Supreme Court Courtroom at the Indiana State House on December 13, 2011, and we thank counsel for their excellent advocacy.

born in distress and subsequently die[,]" (App. B[7] at 330), was not evident and the presumption of her guilt thereof was not strong.

The trial court denied Shuai's request for bail. When reviewing a trial court's denial of bail in a murder case, we reverse only for an abuse of discretion. *Rohr v. State*, 917 N.E.2d 1277, 1280 (Ind. Ct. App. 2009). A decision is an abuse of discretion when it "is clearly against the logic and effect of the facts and circumstances." *Prewitt v. State*, 878 N.E.2d 184, 188 (Ind. 2007).

At the bail hearing, the State presented evidence Shuai ingested rat poison when she was thirty-three weeks pregnant. The Court admitted Shuai's suicide note in which she documented her intention to kill herself and her fetus. The doctors who treated Shuai and A.S. both testified Shuai was admitted to the hospital after ingesting rat poison while thirty-three weeks pregnant; she responded well to treatment for the poisoning; A.S. was delivered via caesarean section with Shuai's consent on December 31, 2010; A.S. suffered a bilateral Grade III intraventricular hemorrhage; and A.S. was removed from life support and subsequently died on January 3, 2011. The coroner indicated A.S.'s death was caused by an intraventricular hemorrhage due to Shuai's ingestion of rat poison.

Shuai attempted to rebut the presumption she should not receive bail by offering evidence to support alternate explanations for the intraventricular hemorrhage that led to A.S.'s death. For example, Shuai presented evidence that indomethacin, one of the drugs

---

[7] There is a separate appendix for each of Shuai's appeals. We cite the appendix for the Bail Appeal as "App. B" and the appendix for the Dismissal Appeal as "App. D."

given to Shuai to stop her contractions, can cause infants to have "intraventricular hemorrhage." (Tr. at 96.) Dr. Lorant, the neonatologist who treated A.S., also testified that a number of other conditions could have caused A.S.'s blood to not clot:

> You know, had I not known about [Shuai] having – having taken the rat poisoning, I would've thought that the baby had an inherited like, hemophilia, a different – a factor deficiency. There would've been – I mean, hemophilia, the kind most people think of, is mostly in boys. But there are different types of factor deficiencies you can have that can affect coagulation. So there's a lot of things.
> The thing – that would've been one of the more common. If you're infected, you can – or have any type of trauma, you can develop something called disseminated intravascular coagulation, and that makes the blood not clot. So there's a lot of things that can cause the blood to have clotting issues.

(*Id*. at 419-20.)

In addition, Shuai presented evidence that called into question the credibility of the autopsy report produced by Dr. Clouse, the forensic pathologist who performed A.S.'s autopsy. That report indicated, "Decedent was injured as a result of her mother ingesting an unknown brand of rat poisoning." (Defendant's Ex. A.) However, Shuai presented evidence that not only did Dr. Clouse fail to conduct any independent research about the effect of rat poison on a child, also she did not consider any other possible cause for A.S.'s intraventricular hemorrhage prior to listing rat poison as the cause of death. Moreover, Dr. Clouse testified she simply relied on the deputy coroner's report in making her determination of A.S.'s cause of death. Yet, Lloyd Sprowl, the deputy coroner, testified:

> [Defense]: Now that statement [regarding the cause of A.S.'s death] in your report is not a – that was not within your personal knowledge. You were just repeating what someone had told you; is that correct?
> [Sprowl]: Yes.
> [Defense]: And you're not medically trained to know whether or not rat

8

poisoning would cause the demise of anybody?
[Sprowl]: That is correct.

(Tr. at 160.)

Finally, Shuai presented evidence Dr. Clouse submitted A.S.'s autopsy report before she received the toxicology report that would indicate if the chemicals from the rat poison were in A.S.'s body. When discussing the toxicology report, Dr. Clouse testified:

> [Defense]: So what does this – does [this] blood test tell you anything that connects the brain bleed to the rat poisoning?
> [Clouse]: No. And it's also a little bit difficult to assess because the baby had received so many blood transfusions that this test, you know, reflects partially the blood that she was given.

(*Id*. at 70-71.)

After the parties presented evidence at a hearing, the trial court found: "Based upon the evidence presented, the Court finds the proof of guilt *is* evident and the presumption of guilt *is* strong." (App. B at 537) (emphasis in original). The court therefore denied Shuai's request to be released on bail. We disagree with the trial court's decision. The defense presented sufficient evidence to rebut the presumption that Shuai is guilty, and the trial court therefore abused its discretion by denying Shuai's motion for bail. Accordingly, we reverse and remand for determination of bail.[8]

---

[8] Shuai also argues the trial court erred in admitting Shuai's medical and psychiatric records and Dr. Clouse's testimony. The parties signed a "Joint Submission Regarding Motion to Dismiss and Suppression Motions," (App. B at 542), in which they agreed: "All suppression, expert qualifications, and other evidentiary motions and issues shall be heard following interlocutory appeal of the motion to dismiss, if necessary." (*Id*.) Thus, the issue is not properly before us.

9

2.     Motion to Dismiss

Generally, we review the denial of a motion to dismiss for an abuse of discretion,

*McCown v. State*, 890 N.E.2d 752, 756 (Ind. Ct. App. 2008), while taking the facts stated in

the charging information as true. *Delagrange v. State*, 951 N.E.2d 593, 594 (Ind. Ct. App.

2011). However, when, as here, the denial rests on the trial court's interpretation of a statute,

we review the judgment *de novo* as a question of law. *McCown*, 890 N.E.2d at 756.

Shuai's motion to dismiss asserted the information was defective because:

a.     The Information does not state the offenses with sufficient certainty;
b.     Both Counts [sic] One and Count Two fail to recite facts that constitute an offense, and must be dismissed under I.C. § 35-34-1-4(a)(5);[9]
c.     The statutes defining murder and feticide, as applied to this Defendant, are unconstitutional and the Information is defective and otherwise invalid as a matter of law, and must be dismissed under I.C. 35-34-1-4(a)(1); and I.C. 35-34-1-6;[10] and,
d.     The Defendant has immunity with respect to the alleged charges and thus the Information must be dismissed pursuant to I.C. 34-1-4-(6) [sic].[11]

(App. B at 84) (footnotes added). We address each contention in turn.

A.     Charging Information

The purpose of an information is to advise the defendant of the crime with which she

is charged so she can prepare a defense. *Myers v. State*, 510 N.E.2d 1360, 1367 (Ind. 1987).

The Sixth Amendment to the United States Constitution and Article I, § 13 of the Indiana

---

[9] Ind. Code § 35-34-1-4(a)(5) allows the trial court to dismiss the charges against a defendant if the "facts stated do not constitute an offense."

[10] Ind. Code § 35-34-1-4(a)(1) allows the trial court to dismiss the charges against a defendant if the "indictment or information, or any count thereof, is defective under section 6 of this chapter." Ind. Code § 35-34-1-6 indicates an "indictment or information is defective when: . . . (3) the statute defining the offense charged is unconstitutional or otherwise invalid" and a motion is filed to that effect.

10

Constitution require a defendant be informed of the nature and the cause of the accusation. In accordance therewith, the State's charging information must be in writing, "setting forth the nature and elements of the offense charged in plain and concise language without unnecessary repetition." Ind. Code § 35-34-1-2(a)(4). The charging information should state the accusations against the defendant in the language of the statute or in words that convey a similar meaning. *Smith v. State*, 465 N.E.2d 702, 704 (Ind. 1984), *reh'g denied*. Minor variances from the language of the statute do not make an information defective, as long as the defendant is not misled or an essential element of the crime is not omitted. *Id*. In her original motion, Shuai alleged the charging information for both charges against her was defective. However in her appeal, her argument addresses only the charging information for murder. Thus we address only that charge.

The State charged Shuai with murder pursuant to Ind. Code § 35-42-1-1(4), which defines murder as "knowingly or intentionally kill[ing] a fetus that has attained viability (as defined in IC 16-18-2-365)." The State's charging information indicated: "COUNT I [:] Bei Bei Shuai, on or about December 23, 2010, did knowingly kill a fetus that had attained viability, namely: voluntarily ingested rat poison when approximately thirty-three (33) weeks pregnant causing [A.S.] to be born in distress and subsequently die[.]"

Shuai argues the facts alleged in the information do not comport with any alleged actions she took. First, no victim died on December 23, 2010; A.S. died on January 3, 2011. Shuai argues no "viable fetus" died because A.S. was born alive on December 31, 2010, at

_____

[11] This is presumably a reference to Ind. Code § 35-34-1-4(a)(6), which allows the trial court to dismiss the

11

which time she was no longer a fetus and had instead become a "human being." *See* Ind. Code § 35-41-1-14 (defining "human being" as "an individual who has been born and is alive.").[12]

The State argues Shuai's contention no "viable fetus" died is inconsistent with case law that statutes are not to be interpreted in a manner that brings about an absurd or unjust result. *See Glotzbach v. State*, 783 N.E.2d 1221, 1227 (Ind. Ct. App. 2003) ("The legislature is presumed to have intended that language used in the statute be applied logically and not bring about an unjust or absurd result."). The State asserts:

> The injury that was the cause of death was inflicted on a fetus, even if that end result was not consummated until after she was born alive through an emergency C-section. It would be an extraordinarily absurd and unfair result to suggest that a person is liable for murder if she inflicts a fatal injury on a baby that is still in the womb and doctors do nothing to save the fetus, allowing it to die in the womb, but that she is immune from liability if doctors deliver the baby to try to save its life but are ultimately unsuccessful. Defendant should not be given immunity simply because doctors tried to save her baby's life.

(Br. B[13] of Appellee at 27.)

The State also contends that even though A.S.'s birth changed her legal status from "viable fetus" to "human being," it was Shuai's actions that caused A.S.'s death. Therefore, the date she ingested rat poison should have no bearing on how Shuai is charged or prosecuted.

---

charges against a defendant if the defendant "has immunity with respect to the offense charged."

[12] The Indiana Code does not appear to define "fetus." Stedman's Medical Dictionary defines fetus as "the product of conception from the end of the eighth week to the moment of birth." *Stedman's Medical Dictionary* 573 (William R. Hensyl, *et al.* eds., 25th ed., 1990).

[13] As there are two sets of briefs in this case, the briefs from the Dismissal Appeal will be indicated as "D" in all citations thereto, and the briefs from the Bail Appeal will be indicated as "B" in all citations thereto.

The State, to prove causation, need only prove the injury inflicted "contributed mediately or immediately" to the victim's death. *Sims v. State*, 466 N.E.2d 24, 25 (Ind. 1984). Even if there was an intervening cause of the victim's death, it does not absolve the defendant of murder unless that intervening cause was so extraordinary and unforeseeable that it would be unfair to hold the defendant responsible. *Id.* The State notes Indiana courts have consistently upheld murder convictions even when a victim died from complications due to surgery or other medical care received for the injury the defendant inflicted on him. *See*, *e.g.*, *Wooley v. State*, 716 N.E.2d 919, 928 (Ind. 1999) (that second person attacked victim did not absolve defendant of responsibility for victim's death when autopsy determined victim died of stab wound inflicted by defendant), *reh'g denied*; *Pittman v. State*, 528 N.E.2d 67, 69-70 (Ind. 1988) (even though victim ultimately died from pulmonary embolism, Pittman was still guilty of murder because he inflicted a stab wound that contributed to the blood clots that eventually killed the victim); and *Gibson v. State*, 515 N.E.2d 492, 496 (Ind. 1987) (Gibson was guilty of murder because victim died of staph infection he would not have contracted but for the injuries Gibson inflicted). Thus, the State asserts, the reference to A.S. as a "viable fetus" rather than a "human being" does not render the charging information defective.

We agree with the State. The State, at trial, will have the burden of proving every element of its case. *Moon v. State*, 823 N.E.2d 710, 714 (Ind. Ct. App. 2005) ("It is well settled that the State has the burden of proving all elements of a charged crime beyond a reasonable doubt."), *reh'g denied, trans. denied*. The classification of A.S. in the

13

information sufficiently apprises Shuai of the charges against her.


B.      Statutory Interpretation

When faced with a question of statutory interpretation, our review is *de novo*. *In re M.W.*, 913 N.E.2d 784, 786 (Ind. Ct. App. 2009). In interpreting a statute, we first decide if the statute is ambiguous. *Id.* If it is not, we need not and do not interpret it, but instead apply its plain and clear meaning. *Id.* If the statute is susceptible to more than one reasonable interpretation, it is ambiguous, and we must determine the legislature's intent so that we can give effect to that intent. *Maroney v. State*, 849 N.E.2d 745, 748 (Ind. Ct. App. 2006). Statutes must be read in harmony with related statutes. *St. Margaret Mercy Healthcare Ctrs., Inc. v. Poland*, 828 N.E.2d 396, 402 (Ind. Ct. App. 2005), *trans. denied*. We assume the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. *B.K.C. v. State*, 781 N.E.2d 1157, 1167 (Ind. Ct. App. 2003).

"It is a cardinal rule of criminal justice, however, that penal statutes are to be strictly construed against the State and that ambiguities therein are to be resolved in favor of the accused." *Pennington v. State*, 426 N.E.2d 408, 410 (Ind. 1981). Nor may criminal statues "be enlarged by construction, implication, or intendment beyond the fair meaning of the language used." *Herron v. State*, 729 N.E.2d 1008, 1010 (Ind. Ct. App. 2000), *trans. denied.* However, penal statutes are not to be read so narrowly as to exclude instances the statute fairly covers or in a manner that disregards legislative purposes and intent. *B.K.C.*, 781

14

N.E.2d at 1167.

The murder statute states, in relevant part, "A person who: (1) knowingly or intentionally kills another human being; . . . [or] (4) knowingly or intentionally kills a fetus that has attained viability (as defined in IC 16-18-2-365), commits murder." Ind. Code § 35-42-1-1. A person engages in conduct "intentionally" if, "when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a). A person engages in conduct "knowingly" if, "when he engages in the conduct, he is aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b). A fetus has attained viability when it has the ability "to live outside the mother's womb." Ind. Code § 16-18-2-365.

The feticide statute states, in relevant part:

A person who knowingly or intentionally terminates a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus commits feticide, a Class B felony. This section does not apply to an abortion performed in compliance with:
    (1) IC 16-34; or
    (2) IC 35-1-58.5 (before its repeal)

Ind. Code § 35-42-1-6.

Shuai argues the plain language of both the murder and feticide statutes "[Does] Not Apply to Pregnant Women in Relation to the Fetuses They Carry." (Br. D of Appellant at 15.) The question whether the murder and feticide statutes can be applied to a woman in Shuai's situation is one of first impression in Indiana. Shuai asserts in order for our murder and feticide statutes to include pregnant women, the language would have to do so explicitly

15

because the relationship between a mother and the fetus she carries is unique and "fundamentally and profoundly different from third-party attacks on pregnant women[.]" (Br. D of Appellant at 16.) In support of that argument, Shuai directs us to *Herron*, 729 N.E.2d at 1011, in which we rejected the State's argument that a mother could be prosecuted for neglect of a dependent based on acts committed prior to the birth of the child that ultimately endanger the child after birth.

Herron ingested cocaine while pregnant. We determined the plain language of the neglect of a dependent statute contemplated "only acts that place one who is a dependent at the time of the conduct at issue in a dangerous situation – not acts that place a future dependent in a dangerous situation." *Id*. Further, we held the applicable statute does not "criminalize conduct that occurs prior to a child's birth." *Id*. "When Indiana's General Assembly has previously sought to criminalize conduct affecting unborn children, it has done so specifically." *Id*. at 1010.

The State argues the statute need not explicitly prohibit a pregnant woman from committing an act against her own fetus. It asserts the result in *Herron* was controlled by the statutory definition of "dependent," which prohibited the State from prosecuting Herron for acts committed before the child was born. There, we distinguished the language of the murder and feticide statutes from that of the neglect statute. Thus, the State contends, *Herron* is of no relevance to Shuai's argument because its holding falls under a different definitional structure.

We decline to adopt Shuai's argument the murder statute is ambiguous as applied to

16

her. The State alleged the existence of facts that could satisfy the elements of murder: Shuai is a "person," the State alleged she intended to kill A.S. by virtue of Shuai's mention of the fetus in the suicide note, and the victim was an entity protected under the murder statute, be it a "viable fetus" or "human being," died.[14] Nor can we find the feticide statute ambiguous as applied here, as it is undisputed Shuai's pregnancy was terminated when A.S. was born, and the State seems prepared to argue it was Shuai's intent to end her pregnancy when she ingested rat poison.[15]

### C. Immunity from Prosecution

---

[14] We need not decide at this stage of the case whether A.S. was a viable fetus when she allegedly was murdered, as it is the State's burden to prove at trial A.S.'s legal status. *See Moon v. State*, 823 N.E.2d 710, 714 (Ind. Ct. App. 2005) ("It is well settled that the State has the burden of proving all elements of a charged crime beyond a reasonable doubt."), *reh'g denied, trans. denied*.

[15] Shuai also argues the murder and feticide statutes are unconstitutional as applied to her. As we may resolve the issue based on the plain language of the statute, we need not address her constitutional arguments. *See Brownsburg Area Patrons Affecting Change v. Baldwin*, 714 N.E.2d 135, 139 (Ind. 1999) ("If a statute is unambiguous, then 'courts must apply the plain language . . . despite perhaps strong policy or constitutional reasons to construe the statute in some other way.'") (quoting *Brownsburg Area Patrons Affecting Change v. Baldwin*, 943 F.Supp. 975, 986 (S.D. Ind. 1996)).

The dissent maintains "Now, for the first time in Indiana's history, without any notice whatsoever, the State decided to prosecute a woman for murder of her child based on her conduct *during* the pregnancy." (*Slip op.* at 28.) The dissent rejects the State's argument that "viable fetus" and "human being" may be used interchangeably, stating, "By arguing that A.S.'s legal status as a viable fetus and as a human being are interchangeable, the State disregards legislative reality and impermissibly attempts to enlarge the murder statute." (*Id*.) As noted above, it is the State's burden to prove all elements of its case, and it should be given the opportunity to do so without the intervention of a reviewing court prior to trial.

> Regarding the application of the feticide statute to Shuai's actions, the dissent suggests:
> In light of Indiana's long-standing statutory and case law history, I conclude that it was never the intention of the legislature that the feticide statute should be used to criminalize prenatal conduct of a pregnant woman. Rather, the statute should be applied to third-party conduct which harms or endangers a non-viable fetus. Moreover, it is axiomatic that courts are obligated to avoid construing a particular statute so as to achieve an absurd or unreasonable result.

(*Id*. at 30.) However, we agree with the State that the more absurd result would be criminal liability for a pregnant woman who harms her fetus but lets it die in the womb, but immunity for a pregnant woman who harms her fetus and allows medical intervention that is ultimately unsuccessful and results in the child's death. As illustrated from this panel's diverging opinions, it is possible the language of the statute could lead to many possibly absurd outcomes.

17

First, Shuai contends the charges against her arise out of a suicide attempt and as suicide is not a crime but a public health issue, the charges against her should be dismissed. In *Prudential v. Rice*, 222 Ind. 231, 238, 52 N.E.2d 624, 626 (1944), our Indiana Supreme Court recognized attempting suicide is not a crime.

The State argues Shuai's charges are based not on her conduct toward herself, but on her conduct towards A.S. The State offers this analogy:

> If a person tries to commit suicide by turning on the gas in her apartment or running her car over a cliff, she may be charged with murder if she survives but a roommate in the apartment or a passenger in the car dies, especially where, as here, there is evidence that the person intended for the roommate or passenger to also die.

(Br. D of Appellee at 20.) The State also argues the record does not support Shuai's characterization of A.S.'s death as an unintended consequence of a suicide attempt. Rather, the State asserts, Shuai's note to Guan indicates she had intent to kill A.S. independent of her intent to kill herself. We agree. Shuai's suicide note, which was addressed to Guan, demonstrates suicide was not her only intended result and, as such we cannot hold she is being improperly prosecuted for her suicide attempt.

Shuai next argues that, at common law, "a pregnant woman was not subjected to criminal prosecution relating to her 'acts' alleged to have harmed her fetus." (Br. B of Appellant at 36.) As in her statutory interpretation argument, Shuai contends the legislature is therefore required to expressly include pregnant women as possible perpetrators in the elements of the murder and feticide statutes. *See Caesar's Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010) ("there is a presumption that the legislature does

18

not intend to make any change in the common law beyond those declared in either express terms or by unmistakable implication").

We recognize English common law unless our legislature explicitly abrogates it: [t]he law governing this state is declared to be:

> First. The Constitution of the United States and of this state.
>
> Second. All statutes of the general assembly of the state in force, and not inconsistent with such constitutions.
>
> Third. All statutes of the United States in force, and relating to subjects over which congress has power to legislate for the states, and not inconsistent with the Constitution of the United States.
>
> Fourth. The common law of England, and statutes of the British Parliament made in aid thereof prior to the fourth year of the reign of James the First (except the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth, and the ninth chapter of thirty-seventh Henry the Eighth,) and which are of a general nature, not local to that kingdom, and not inconsistent with the first, second and third specifications of this section.

Ind. Code § 1-1-2-1 (footnote omitted). Pursuant to that hierarchy of laws, common law is the governing law of our state only if the common law is from England during the periods enumerated in the statute. Shuai does not indicate the specific English common law that recognized such broad immunity for a pregnant woman who committed acts that harmed her fetus.

Other states have advanced this common law immunity for pregnant women, but have not cited a specific English common law supporting their positions. For example, Florida's supreme court stated:

> At common law an operation on the body of a woman quick with child, with

19

> intent thereby to cause her miscarriage, was an indictable offense, but it was not an offense in her to so treat her own body, or to assent to such treatment from another; and the aid she might give to the offender in the physical performance of the operation did not make her an accomplice in his crime. The practical assistance she might thus give to the perpetrator did not involve her in the perpetration of his crime. It was in truth a crime which, in the nature of things, she could not commit.

*State v. Ashley*, 701 So.2d 338, 340 (Fla. 1997) (quoting *State v. Carey*, 56 A. 632, 636 (Conn. 1904)). *See also Hillman v. State*, 503 S.E.2d 610, 612 (Ga. Ct. App. 1998) ("[t]he female upon whom a criminal abortion has been performed is not an accomplice with the perpetrator of the offense, as she can not be indicted for that offense") (quoting *Gullatt v. State*, 80 S.E. 340, 341 (Ga. Ct. App. 1913), *reh'g denied*).

> Legal scholars have opined:

> While some scholars argue that paternalism regarding women in the eighteenth and nineteenth centuries is the primary root of this immunity, the early procedural practicalities of prosecuting abortions were a contributing factor. In order to convict an abortionist, it was almost always necessary for prosecutors to present the testimony of the woman. In labeling the participating woman as an accomplice to the crime, the prosecution would have been required to adduce corroborating testimony to convict the defendant. By the very nature of performing abortions, particularly illegal ones, the availability of other witnesses would have been unusual, thereby making prosecution under abortion statutes effectively impossible. To avoid this obstacle, courts defined the female undergoing illegal abortion as a victim or simply declared that there was no accomplice.

Staci Visser, *Prosecuting Women for Participating in Illegal Abortions: Undermining Gender Equality and the Effectiveness of State Police Power*, 13 Journal of Law & Family Studies 171, 175 (2011).[16]

---

[16] This same premise is suggested in Ashley Gorski, *The Author of Her Trouble: Abortion in Nineteeth- and Early Twentieth-Century Judicial Discourses*, 32 Harv. J. L. & Gender 431, 443-44 (2009).

The only English common law that addresses the death of a fetus is stated by Lord Coke:

> If a woman be quick with childe, and by a potion or otherwise killeth it in her wombe, or if a man beat her, whereby the childe dyeth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder; but if the childe be born alive and dyeth of the potion, battery, or other cause, this is murder[.]

Coke, Edward, *The Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown, and Criminal Causes*, page 50 (1680).

As the only original statement of English common law we obtained regarding this question contradicts Shuai's allegation that women had absolute immunity, Ind. Code § 1-1-2-1 does not require us to adopt her premise a pregnant woman has complete common law immunity from prosecution for actions she commits against her own fetus. We therefore decline to do so.

Because the charging information was not deficient, the plain language of the statute applies to Shuai's actions, and Shuai has not demonstrated common law immunity for pregnant women who harm their own fetuses, we cannot say the trial court abused its discretion when it denied Shuai's motion to dismiss.[17] We accordingly affirm that denial.

---

[17] The dissent believes holding Shuai's actions are covered by the feticide statute would result in the criminalization of pregnant women who smoke, drink, or take "over-the counter (sic) cold remedies and sleep aids." (*Slip op*. at 8.) However, the feticide statute provides the actor must terminate a human pregnancy *knowingly,* with the "intention other than to produce a live birth or to remove a dead fetus." Ind. Code § 35-42-1-6. Thus, the hypothetical situations the dissent presents would not be criminalized unless the additional element of intent was present. There is evidence Shuai had such intent.

21

## CONCLUSION

Because Shuai rebutted the presumption of guilt required to hold her without bail, we reverse the denial of her motion for bail and remand for determination of the amount of bail. However, as the charging information was sufficient to apprise Shuai of the charges against her, the murder statute is unambiguous and its plain language encompasses her alleged actions, and she does not have immunity from prosecution, we affirm the denial of her motion to dismiss and remand for further proceedings.

Reversed in part, affirmed in part, and remanded.

NAJAM, J., concurs.

RILEY J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

BEI BEI SHUAI,                     )
                                          )
    Appellant-Defendant,      )
                                          )
        vs.                 )      No. 49A02-1106-CR-586
                                          )
STATE OF INDIANA,        )
                                          )
    Appellee-Plaintiff.        )

**RILEY, Judge, concurring in part and dissenting in part**

While I agree with the majority's decision to reverse and remand for determination of Shuai's bail, I respectfully disagree with its denial of Shuai's motion to dismiss. Based on the facts and charging information before me, I would dismiss both the murder and attempted feticide Counts as charged by the State.[1]

A charging information must allege the elements of the crime such that the accused is sufficiently apprised of the nature of the charges against him so that he may anticipate the proof and prepare a defense in advance of trial. *Zitlaw v. State*, 880 N.E.2d 724, 730 (Ind. Ct App. 2008), *trans. denied*. To further this end, the information must be in writing and allege the commission of an offense by setting forth the nature and elements of the offense charged

---

[1] While the majority claims that Shuai "only argues for the dismissal of the murder charge in her appeal," it is abundantly clear from Shuai's discussion of the attempted feticide charge in her appellate briefs that she advocates for the dismissal of both charges. *Slip op*. p. 10.

23

in plain and concise language without unnecessary repetition. *Truax v. State*, 856 N.E. 2d 116, 123 (Ind. Ct. App. 2006). A trial court considering a motion to dismiss an indictment or information in a criminal case need not rely entirely on the text of the charging information but can hear and consider evidence in determining whether a defendant can be charged with the crime alleged. *Zitlaw*, 880 N.E.2d at 730.

Here, as noted by the majority, the State charged Shuai with murder by killing a viable fetus on December 23, 2010, by ingesting rat poison when she was approximately thirty-three weeks pregnant, causing A.S. to be born in distress and subsequently die, pursuant to I.C. § 35-42-1-1(4). In Count II, Shuai was charged with attempted feticide because she knowingly terminated a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus, in accordance with I.C. §§ 35-42-1-6; 35-41-5-1. To determine whether Shaui was charged appropriately, as concluded by the majority, I am faced with a question of statutory interpretation.

Interpretation of a statute is a pure question of law and is reviewed *de novo*. *Herron v. State*, 729 N.E.2d 1008, 1010 (Ind. Ct. App. 2000), *trans. denied*. The primary goal in interpreting the meaning of a statute is to determine and effectuate legislative intent. *Id*. We therefore look to the plain language of the statute and attribute the common, ordinary meaning to terms found in everyday speech. *Id*. Where the General Assembly has defined a word, however, this court is bound by that definition. *Id*. Moreover, it just as important to recognize what a statute does not say as it is to recognize what it does say. *Id*. A court may not read into a statute that which is not the expressed intent of the legislature. *Id*. Most

24

importantly, criminal statutes cannot be enlarged by construction, implication, or intendment beyond the fair meaning of the language used and should be strictly construed against the State. *Id*. Even though an act may fall within the spirit of the statute, it will not constitute a crime unless it is also within the words of the statute. *Id*.

A. *General Legislative History*

Prior to 1980, the Homicide laws included, in this order, the following categories: (1) murder; (2) causing suicide; (3) voluntary manslaughter; (4) involuntary manslaughter; (5) reckless homicide; and (6) feticide. The first five statutes in the Homicide chapter focused on a person knowingly or intentionally killing another human being, with "human being" defined by I.C. § 35-41-1-14 as "an individual who has been born and is alive." The sixth statute—feticide—was viewed as an extension of the laws of Homicide to cover the situation in which the victim is not a "human being," but a fetus. *See Baird v. State*, 604 N.E.2d 1170, 1189 (Ind. 1992). Consistent with this grouping of Homicide laws, our courts have applied the feticide statute in cases where third-parties harm pregnant women and cause death to the fetus they carry. *See id; see also Perigo v. State*, 541 N.E.2d 936 (Ind. 1989) (defendant beat his pregnant girlfriend, killing her and her fetus).

In 1997, in response to the highly publicized shooting of a pregnant woman resulting in the stillborn birth of her eight-and-a-half month old fetus, the legislature made changes to several Indiana statutes while, at the same time, it left the eighteen-year-old feticide statute intact. *See* P.L. 261-1997. During this round of statutory revisions, the legislature focused on the murder statute and added a new sub-section 4 which covered the murder of a viable

25

fetus. As such, the revised murder statute read as follows:

A person who:

(1) knowingly or intentionally kills another human being;

(2) kills another human being while committing, or attempting to commit arson, burglary, child molesting, consumer product tampering, criminal deviate conduct, kidnapping, rape, robbery, human trafficking, promotion of human trafficking, sexual trafficking of a minor, or carjacking;

(3) kills another human being while committing or attempting to commit:
    (A) dealing in or manufacturing cocaine or a narcotic drug (I.C. § 35-48-4-1);
    (B) dealing in or manufacturing methamphetamine (I.C. § 35-48-4-1.1);
    (C) dealing in a schedule I, II, or III controlled substance (I.C. § 35-48-4-2);
    (D) dealing in a schedule IV controlled substance (I.C. § 35-48-4-3); or
    (E) dealing in a schedule V controlled substance or

(4) knowingly or intentionally kills a fetus that has attained viability;

commits murder, a felony.

I.C. § 35-42-1-1. Likewise, both the manslaughter and involuntary manslaughter statutes were amended to include the killing of a viable fetus. *See* I.C. §§ 35-42-1-3; -4. In each statute, viability was defined as "the ability of a fetus to live outside the mother's womb." I.C. § 16-18-2-365. The legislature also revised the aggravated battery statute to include the circumstance when battery results in the "loss of a fetus," as a Class B felony. I.C. § 35-42-2-1.5(c).

Approximately ten years later, in April of 2008, a bank robber shot bank teller Katherine Shuffield, who was then five months pregnant with twins, resulting in the twins' death. The State presented a proposal to the legislature to amend Indiana's murder statute by

26

removing the requirement of viability, thereby allowing a third-party to be prosecuted for the death of a fetus at any stage of its development. Refusing to change the murder statute as requested, the legislature responded by amending the feticide statute instead, changing its status from a Class C felony to a Class B felony and thus substantially increasing the crime's sentence.

### B. *Application*

#### 1. *Murder*

Now, for the first time in Indiana's history, and without any notice whatsoever, the State decided to prosecute a woman for murder of her child based on her conduct *during* her pregnancy. According to the charges brought by the State, Shuai, when thirty-three weeks pregnant, knowingly or intentionally killed a viable fetus on December 23, 2010, by ingesting rat poison, pursuant to I.C. § 35-42-1-1(4). However, the facts reflect that on December 23, 2010, Shuai did not kill a viable fetus; rather, she gave birth to A.S. on December 31, 2010. The State did not present any evidence that Shuai did anything to endanger A.S. after her birth. A.S. died on January 3, 2011. The State now contends that the categories of "viable fetus" and "another human being," as both are defined in the murder statute, can be used interchangeably with the focus being on Shuai's actions, not A.S.'s legal status.

Whenever Indiana's General Assembly sought to criminalize conduct affecting unborn children, it did so specifically. As noted above, prior to 1997, a defendant could only murder "another human being;" with "human being" defined as "an individual who has been born and is alive." *See* § 35-41-1-14. In 1997, the legislature opted to extend the statute to the

27

case of the unborn child, and did so by creating a new category of murder victims. Rather than to redefine the term of "human being" to include a fetus, the legislature in a new fourth category declared murder to include the killing of a viable fetus. Nowhere in Indiana's laws is the term "human being" or "person" used as a substitute for, or as inclusive of, a conceptus or fetus (be it viable or non-viable). Therefore, I conclude that when the legislature determines to confer legal personality on a fetus for certain limited purposes, it expresses that intent in specific, explicit, and appropriate terms; the corollary, of course, is that when the legislature speaks generally of a human being or person, it impliedly but plainly excludes a fetus. By arguing that A.S.'s legal status as a viable fetus and as a human being are interchangeable, the State disregards legislative reality and impermissibly attempts to enlarge the murder statute. I conclude that by charging Shuai with the intentional killing of a viable fetus, the State failed to establish the essential element of that crime, *i.e.*, that A.S. was a viable fetus. Rather, because Shuai gave birth to A.S., a human being who lived until January 3, 2011, the murder charge should be dismissed.

## 2. *Attempted Feticide*

In Count II, the State charged Shuai with attempted feticide because she tried to "knowingly terminate a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus" when she ingested rat poison, a Class B felony. *See* I.C. § 35-42-1-6; 35-41-5-1. As noted above, throughout its history, Indiana courts have applied the feticide statute to situations where a third party killed a non-viable fetus. In effect, the current feticide statute was enacted as a reaction to the killing of non-viable twin fetuses by a

28

bank robber. The State now urges us to apply the feticide statute to a pregnant woman's prenatal conduct.

In 1835, Indiana enacted a statute relating to the procurement of a miscarriage which targeted third parties who cause a woman to miscarry. *See* Ind. Rev. Stat. Ch. XXVI, § 3, p. 224 (1838). Fifty years later, in 1881, a misdemeanor statute was enacted directed specifically at pregnant women, which provided that

> Every woman who shall solicit of any person any medicine, drug, or substance or thing whatever, and shall take the same, or shall submit to any operation or other means whatever, with intent thereby to procure a miscarriage, except when by a physician for the purpose of saving the life of mother or child, shall be fined not more than $500 nor less than ten dollars, and imprisoned in the county jail not more than twelve months or less than 30 days, and any person who in any manner whatever unlawfully aids or assists any such woman to be a violation of this section, shall be liable to the same penalty.

1894 Ind. Acts, ch. 651, § 1997. Significantly, even with the possibility of holding a woman criminally liable for her own prenatal conduct which procured a miscarriage, the misdemeanor statute was only applied to third parties who performed or procured the miscarriage.[18] In 1977, both miscarriage statutes were repealed.

The only recent Indiana case in which the State has charged a pregnant woman for prenatal conduct which endangered her unborn child was in the realm of neglect of a dependent. In *Herron*, the State unsuccessfully prosecuted a woman for ingesting cocaine during her pregnancy, which caused harm to her child after his birth. *Herron v. State*, 729 N.E.2d 1008, 1009 (Ind. 2000), *trans. denied*. We rejected the State's argument and found

29

that the plain language of neglect of a dependent statute contemplated "only acts that place one who is a dependant at the time of the conduct at issue in a dangerous situation—not acts that place a future dependent in a dangerous situation." *Id*. at 1011. The *Herron* court concluded that the applicable statutes "do not criminalize conduct that occurs prior to a child's birth." *Id*.

The State now applies the feticide statute in an end-run around the abolished miscarriage statutes and *Herron*'s conclusion in an attempt to criminalize the prenatal behavior of a pregnant woman. In light of Indiana's long-standing statutory and case law history, I conclude that it was never the intention of the legislature that the feticide statute should be used to criminalize prenatal conduct of a pregnant woman. Rather, the statute should only be applied to third-party conduct which endangers or harms a non-viable fetus. Moreover, it is axiomatic that courts are obligated to avoid construing a particular statute so as to achieve an absurd or unreasonable result. If the feticide statute is interpreted as advocated by the State and applied to women's prenatal conduct, it could have an unlimited scope and create an indefinite number of new 'crimes.' For example, many over-the counter cold remedies and sleep aids contain warnings that pregnant women should not use them without medical supervision, yet doing so cannot constitute a crime. It is also common knowledge that smoking and alcohol use during pregnancy may cause harm to the fetus. It is illogical to punish such prenatal behavior to the exclusion of other behaviors, if the focus is

---

[18] *See, e.g., Montgomery v. State*, 80 Ind. 338 (Ind. 1881); *Traylor v. State*, 101 Ind. 65 (Ind. 1885); *Seifert v. State*, 67 N.E. 100 (Ind. 1903); *Carter v. State*, 87 N.E. 1081 (Ind. 1909); *Swanson v. State*, 52 N.E.616 (Ind. 1944).

on resulting harm to the fetus. In short, the State's interpretation might lead to a slippery slope whereby the feticide statute could be construed as covering a full range of a pregnant woman's behavior. Courts must construe statutes with an eye toward reason and logic and dictated by legislative intent. Here, by condoning the State's argument, the majority fails to do so.

Finally, I am mindful that it is not the purpose of the court to make legislation in the guise of judicial interpretation or construction. Whether to impose a legal duty or obligation on a pregnant woman to her unborn child and the extent of that obligation is a matter only for the legislature and is to be made after thorough investigative study and debate of all the implications of its decision.

I would dismiss both charges.