# FOR PUBLICATION



FILED

Jun 29 2012, 9:00 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MICHAEL J. McDANIEL**
New Albany, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFFREY A. WEISHEIT, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 10A01-1202-CR-58 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

INTERLOCUTORY APPEAL FROM THE CLARK CIRCUIT COURT
The Honorable Daniel E. Moore, Judge
Cause No. 10C01-1008-MR-601

**June 29, 2012**

**OPINION - FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Jeffrey A. Weisheit was charged with the death penalty, two counts of murder, and one count of Class A felony arson for killing his girlfriend's young children in an early morning house fire in Evansville, Indiana, in April 2010 and then fleeing the state. Weisheit requested to be released on bail, but the trial court denied his request. Weisheit now appeals that denial. Because Weisheit has failed to prove that the proof is not evident and the presumption of his guilt is not strong, we affirm the trial court's denial of bail in this capital case.

## Facts and Procedural History

Weisheit dated Lisa Lynch. Weisheit and Lisa lived together along with Lisa's two children, eight-year-old Alyssa and five-year-old Caleb, in a house on Fischer Road in Evansville. Lisa, who was pregnant with Weisheit's child, worked nights. Weisheit was in charge of Alyssa and Caleb when Lisa worked.

In the early morning hours of April 10, 2010, the German Township Volunteer Fire Department was dispatched to a fire at Weisheit and Lisa's rural home. Lisa was at work at the time, and Weisheit was in charge of the children. When the deputy fire chief arrived at 3:53 a.m., the house was fully engulfed in flames and had been burning for awhile. Weisheit's vehicle was missing, and the whereabouts of the children were unknown.

Additional fire departments were summoned because of the size of the fire. When the fire was finally under control around 8:00 a.m., the remains of five-year-old Caleb were found lying face down on a burned mattress; he had been hogtied with duct tape and

2

had a washcloth, which had blood on it, duct-taped in his mouth. In addition, at least two road flares were found on the mattress near Caleb's body. Later, during the autopsy, a burned road flare was found in Caleb's underwear. After calling in a cadaver dog, around 3:00 p.m., eight-year-old Alyssa's remains were discovered in the fetal position in a bedroom closet The cause of death for both children was respiratory arrest due to asphyxia from the inhalation of soot. Def. Ex. 1, 2 (Ex. Vol. II).

Deputy State Fire Marshal Clayton Kinder arrived on the scene around noon. He observed flares "in the area of [Caleb]," "[u]nderneath or adjacent to where [Caleb] was located." Tr. p. 351, 353. Although the origin and source of the fire were never determined and accelerants were not found, based on the flares Kinder concluded that the fire was "incendiary," which means "a fire that's set intentionally under circumstances that the person knows the fire should not be set." *Id.* at 364.

Before the children's bodies were found, the police tried to contact Weisheit several times through OnStar[1]; Weisheit responded but refused to speak with Lisa. OnStar, however, was able to track Weisheit's location. Around 5:00 a.m., police officers in Boone County, Kentucky, were alerted by dispatch to locate a yellow Camaro driven by Weisheit. The officers located Weisheit on Interstate 71 and tried to stop him. Weisheit accelerated onto nearby Interstate 75, and a high-speed pursuit began. The pursuit went through a number of small towns, and their units became involved in the

---

[1] According to OnStar's website:

Built into more than 30 GM models, OnStar keeps you safely connected while in your vehicle. With OnStar, you'll enjoy services like Automatic Crash Response, Navigation, Roadside Assistance and Hands-Free Calling.

OnStar, *liveOn*, https://www.onstar.com/web/portal/landing (last visited June 21, 2012).

pursuit, too. Around 7:30 a.m., the pursuit ended in Covington, Kentucky, when stop sticks disabled Weisheit's car. Weisheit then jumped out of his car while it was still moving, charged at the officers, asked them to kill him, and threw a hunting knife at an officer's head. At this point, Weisheit was tased and fell to the ground. During the fall, Weisheit hit his head on the pavement. Weisheit was transported to St. Elizabeth Hospital in Florence, Kentucky, and was later transferred to University of Cincinnati Hospital. Weisheit, who suffered a bruise to the front part of his brain with some bleeding, spent one night at University of Cincinnati Hospital and was released. According to the State's expert, Weisheit had a grade I concussion, which is the mildest grade. *Id.* at 38.

Inside Weisheit's car, the police found duct tape that matched the duct tape used on Caleb. In fact, lab testing showed that the tear lines from the duct-tape roll and the duct tape on Caleb matched. In addition, Weisheit had $4000 in $100 bills and several packed suitcases.

While Weisheit was in the hospital in Kentucky waiting transfer to University of Cincinnati Hospital, detectives from the Vanderburgh County Sheriff's Department arrived, read Weisheit his *Miranda* rights, and interviewed him. When the detectives spoke to Weisheit about the police pursuit, he would engage; however, Weisheit became disengaged when they asked him about what happened in Evansville. During the interview, Weisheit was aware that he was in the hospital because he "got tased and . . . fell backwards and hit [his] head." State's Ex. 1A, p. 3 (Ex. Vol. I). He explained that he was provoking the officers in the hopes that they would kill him because "[he] just didn't

4

care" and "just wanted to end [his] life." *Id.* at 3, 20. Although Weisheit said that he did not remember what happened at his house the previous night, he did remember several things: Alyssa and Caleb went to bed around 8:00 p.m., no one else was at the house, he packed his belongings in his car, and he left the house around 3:00 a.m. without the children. Weisheit was planning on "leaving for good" because he was "[t]ired" of it all: "[t]ired of the kids, tired of the job, tired of the wife, tired of all the bullshit." *Id.* at 10, 15. He said he did not take Alyssa and Caleb with him because "[he] didn't want um." *Id.* at 10. When asked how he set the house on fire, Weisheit answered "I don't know." *Id.* at 8-9. Weisheit requested an attorney about twenty minutes into the interview, at which point the interview ceased.

The police later learned that in the weeks leading up to the fire, Weisheit stopped paying his bills, even though he always paid his bills on time, and quit his steady job. In addition, Weisheit had an engagement ring for Lisa in layaway. Weisheit, however, asked the store if he could get his $700 back because he was going to Brazil and needed the money. The police also learned that Weisheit had denied to people that he was the father of Lisa's unborn child; subsequent DNA tests, however, proved that Weisheit was in fact the father.

On April 12, 2010, the State charged Weisheit with two counts of murder and one count of Class A felony arson. No bail was set. The State later filed an additional count charging Weisheit with the death penalty. Appellant's App. p. 3-4. Weisheit sought a change of venue, which the trial court granted, and the case was transferred from Vanderburgh County to Clark County.

5

Weisheit has filed numerous motions in his capital case. Specifically, Weisheit filed a motion to suppress the flares, which the trial court denied. We recently denied Weisheit's petition to accept interlocutory appeal of that order. *Weisheit v. State*, No. 10A01-1203-CR-112 (Ind. Ct. App. Apr. 9, 2012). Weisheit also filed a motion to suppress the statements he made to the detectives at St. Elizabeth Hospital in Kentucky, which the trial court also denied. Appellant's App. p. 126-34. Weisheit, however, did not seek interlocutory appeal of that order.

In September 2011, almost one and a half years after he was charged, Weisheit requested to be released on bail because "the State's evidence of the crimes charged is not strong and the proof of allegations is not evident." *Id.* at 141. The State opposed bail. The trial court held a hearing in December 2011, at which numerous witnesses testified and exhibits were admitted. In January 2012, the trial court entered findings of fact and conclusions of law denying bail.[2] The trial court carefully delineated the facts and found that Weisheit "offered no evidence that would indicate a lack of culpability for any of the crimes charged in this case" and Weisheit's "flight from the scene of the crime

---

[2] Weisheit appears to argue on appeal that the trial court's findings and conclusions are faulty because they are similar to the State's proposed findings and conclusions. Even if the trial court's findings and conclusion were verbatim to the State's proposed findings and conclusions, which they are not, *see* Appellant's App. p. 164-67, our Supreme Court has stated that although it does not encourage the wholesale adoption of findings and conclusions of either party, it declines to find bias solely on that basis. *Pruitt v. State*, 903 N.E.2d 899, 940 (Ind. 2009), *reh'g denied*, 907 N.E.2d 973 (Ind. 2009).

Weisheit also makes a challenge to Finding No. 7, which states:

> The Accused produced evidence that would demonstrate that the fire had been going for a significant time before fire agencies arrived at the scene and that the Accused had engaged in flight to leave the scene of the fire.

Appellant's App. p. 170. We, however, find that the evidence supports this finding. Weisheit also argues that the fact that he had a large amount of cash has no relevance to the crimes charged. We disagree. A large amount of cash is evidence of flight.

is some evidence of his culpability and creates a presumption of his guilt under the law." *Id.* at 171. Accordingly, the court concluded that "the proof is evident and the presumption of guilt is strong such that bail for [Weisheit] should be denied." *Id.* at 172.

Weisheit now appeals the denial of bail. *See Bradley v. State*, 649 N.E.2d 100, 106 (Ind. 1995) ("The denial of bail is deemed a final judgment appealable immediately, without waiting for the final judgment following trial."), *reh'g denied.* According to the Odyssey Case Management System, Weisheit's death-penalty trial is currently scheduled to begin August 6, 2012.

**Discussion and Decision**

Weisheit contends that the trial court erred in denying him bail.[3] When reviewing a trial court's denial of bail in a murder case, we reverse only for an abuse of discretion. *Shuai v. State*, 966 N.E.2d 619, --- (Ind. Ct. App. 2012), *trans. denied.* A decision is an abuse of discretion when it "is clearly against the logic and effect of the facts and circumstances." *Id.*[4]

Article 1, Section 17 of the Indiana Constitution recognizes the right to bail: "Offenses, other than murder and treason, shall be bailable by sufficient sureties. Murder or treason shall not be bailable, when the proof is evident, or the presumption is strong." Indiana Code section 35-33-8-2(a) echoes this constitutional provision: "Murder is not bailable when the proof is evident or the presumption strong. In all other cases, offenses are bailable." Thus, in a murder case, the presumption is against the right to be admitted

---

[3] Weisheit also argues that he is entitled to a jury instruction on circumstantial evidence. We do not address this issue because it is not properly before us.

[4] Weisheit asks us to apply a de novo standard of review. Appellant's Br. p. 15. But because the case law is clear, we apply an abuse-of-discretion standard.

7

to bail.  *Shuai*, 966 N.E.2d at ---; *Bozovichar v. State*, 230 Ind. 358, 366, 103 N.E.2d 680, 683 (1952).  Accordingly, "[a] person charged with murder has the burden of proof that he should be admitted to bail."  Ind. Code § 35-33-8-2(b); *see also Phillips v. State*, 550 N.E.2d 1290, 1294 (Ind. 1990) ("In a murder case, the presumption is against the right to be admitted to bail, and the burden is on the accused to show that the proof is not evident nor the presumption of his guilt strong."), *reh'g denied*; *Bozovichar*, 103 N.E.2d at 683 ("The burden is on the [accused] to show that the proof is not evident or the presumption of guilt [is not] strong.").[5]

Our Supreme Court has explained the rationale behind this rule.  The purpose of bail is to ensure the presence of the accused at trial, and the factors to be considered in setting the amount of bail are the nature of the offense, the possible penalty that could attach, the likelihood of the accused appearing at trial, and the financial position of the accused.  *Phillips*, 550 N.E.2d at 1294.  Murder is the most serious charge that can be lodged by the State against an individual and carries with it the possibility of a death sentence.  *Id.* at 1294-95; *see also* Ind. Code § 35-50-2-3.  Because of the seriousness of the charge and the possible penal consequences, there is a presumption that no amount of money will be sufficient to secure the accused's presence at trial.  *Phillips*, 550 N.E.2d at 1295.

Here, we have a capital case involving the murder of two children and a defendant who has already fled the jurisdiction once, with plans of making it as far away as Brazil before OnStar gave away his location.  This case perfectly demonstrates the valid

---

[5] There is some question as to what the burden of proof is, with each side advocating a different test.  *See* Appellee's Br. p. 8 (probable-cause standard); Appellant's Reply Br. p. 3 (clear and convincing evidence).  Given the strength of the evidence in this case, we do not need to resolve this question.

interests behind this well-established rule. The record shows that Weisheit and the children were alone in the house until he left at 3:00 a.m. When the deputy fire chief arrived at 3:53 a.m., the house was fully engulfed in flames. When the fire scene was investigated, Caleb's body was found lying face down on a burned mattress hogtied with duct tape and had a washcloth duct-taped in his mouth. Alyssa's body was later found in a bedroom closet. Although the cause of the fire was never determined, road flares were found on the mattress near Caleb's body and in his underwear. Based on the flares, Deputy State Fire Marshal Kinder concluded that the fire was incendiary, or intentionally set.

Before the children's bodies were found, the police tried to contact Weisheit through OnStar in an effort to locate the children. OnStar made contact, but Weisheit refused to speak with Lisa. Through the help of OnStar, Weisheit was located in Kentucky, and a high-speed chase ensued. When the chase finally ended, Weisheit jumped out of his moving car, yelled at the officers to kill him, and threw a hunting knife at an officer's head. The police found in Weisheit's car a roll of duct tape that matched the duct tape used on Caleb as well as several packed suitcases. Weisheit also had $4000 in cash. During the interview with Vanderburgh County detectives, although Weisheit claimed not to remember much about the night before, he did say some things that were incriminating. When asked how he set the house on fire, Weisheit answered, "I don't know." State's Ex. 1A, p. 8-9 (Ex. Vol. I). Weisheit told the detectives that he was planning on "leaving for good" because he was "[t]ired" of it all: "[t]ired of the kids,

tired of the job, tired of the wife, tired of all the bullshit." *Id.* at 10, 15. He said he did not take the children with him because "[he] didn't want um." *Id.* at 10.

The police later learned that Weisheit had inquired about selling back Lisa's engagement ring because he was going to Brazil and needed the money. In addition, Weisheit had recently quit his job and stopped paying bills, which was uncharacteristic of him. The police also learned that Weisheit had denied to people that he was the father of Lisa's unborn child; subsequent DNA tests, however, proved that Weisheit was in fact the father.

At the bail hearing, Detective Kerri Blessinger, the lead investigator in this case, aptly summarized the evidence establishing that Weisheit murdered the children:

> More the totality of circumstances during the day of the investigation, you know. Obviously Caleb being bound, gagged and left, the house was fully engulfed upon the fire department's arrival. There was another child found in the home. And we were unable to locate Jeff Weisheit at the time, who was caring for the children. . . . [W]hen [flares are] found underneath the child and the house is on fire and the flares are under the baby, then there is that. . . . [Weisheit] was the last person known with the children. He couldn't be located the night of the fire. You know, it was his responsibility to care for those children. You know, he ran from police, he was located in another state. There was a series of circumstances that would lead you to believe that he is the one that committed this crime.
> * * * * *
> [A]fter [Weisheit] was located out of state after fleeing from police in a very high speed chase, the roll of duct tape that was found in his car was later confirmed to match that that was taken off the mouth of the baby.

Tr. p. 372-73, 374.

After a bail hearing in which five witnesses testified and nearly 100 exhibits were admitted, the trial court concluded that the proof was evident and the presumption was strong that Weisheit killed Alyssa and Caleb in the fire. Even though many questions

10

remain, we agree with the trial court that Weisheit has failed to meet his burden of proof.

Accordingly, the trial court did not abuse its discretion in denying Weisheit bail.

Affirmed.

CRONE, J., and BRADFORD, J., concur.